# EXHIBIT O




DEPARTMENT OF EDUCATION
Of the
CITY OF NEW YORK

--------------------------

In the Matter of:

███████████                    Case No.:  125343

------------------------X

District #3
131 Livingston St.
Brooklyn, NY 11201

Wednesday
June 9, 2010

The above-entitled matter came on for hearing
at 10:49 a.m.

BEFORE:         RALPH PENNINGTON, JR.,
                Impartial Hearing Officer

A P P E A R A N C E S :

For the Student:

LEAH HILL, Attorney
ALEXANDRA ALVAREZ, Legal Intern/Representative
RACHEL WU, Legal Intern
KASI LEGRAND, Social Worker/MSW
AARON SCHEINWALD, Legal Intern

For the Department of Education:

WILLIAM R. WOODS, CFN ASE

I N D E X

| WITNESS | DIRECT | CROSS | RE DIRECT | RE CROSS | V. D. | J |
|---------|--------|-------|-----------|----------|-------|---|

E X H I B I T S

| PARENT | DESCRIPTION | I.D. | IN EV. |
|--------|-------------|------|--------|
| 1 | IEP dated 3/17/07, 15 pages | 11 | 13 |
| 2 | IEP, dated 3/20/08, 13 pages | 11 | 13 |
| 3 | IEP, dated 11/13/08, 13 pages | 11 | 13 |
| 4 | '08-'09 student report card, 1 page, Dated 6/1/09 | 12 | 13 |
| 5 | Letter from ███████ dated 6/18/09, 1 page | 12 | 13 |
| 6 | '09 social history update, 4 pages, Dated 9/23/09 | 12 | 13 |
| 7 | '09 teacher's progress report, 4 pages, Dated 9/24/09 | 12 | 13 |
| 8 | '09 FBA, 7 pages, dated 9/24/09 | 12 | 13 |
| 9 | '09 Psychological/Educational Vocational assessments, 17 pages, Dated 9/25/09 | 12 | 13 |
| 10 | IEP, dated 10/2/09, 10 pages | 12 | 13 |
| 11 | Student progress update, 2 pages, Dated 11/5/09 | 12 | 3 |
| 12 | 2010 report card, 1 page, Dated 3/12/10 | 12 | 13 |
| 13 | 2010 audiological exam results, 1 page, dated 3/30/10 | 12 | 13 |
| 14 | 2010 speech eval summary, 6 pages, Dated 3/29/10 | 13 | 13 |
| 15 | 2010 speech eval fall report, 13 pages, Dated 4/30/10 | 13 | 13 |
| 16 | 2010 Neuropsych eval report, 6 pages, Dated 5/1/10 | 13 | 13 |

| DEPARTMENT OF EDUCATION | DESCRIPTION | I.D. | IN EV. |
|-------------------------|-------------|------|--------|

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone 212-227-7440 * 800-221-7242 * Fax 212-227-7524

3

P R O C E E D I N G S

1   HEARING OFFICER RALPH PENNINGTON, JR.:
2   Ladies and gentlemen, my name is Ralph
3   Pennington.  I've been designated by the
4   Impartial Hearing Office to hear the case of
5   ▇▇▇▇▇▇, Case Number 125343. I'd like to
6   inform the parties that I am not an employee of
7   the New York City Department of Education and I
8   have no personal or professional interests which
9   would conflict with my impartiality in this
10  matter.  A copy of my resume is available in the
11  Impartial Hearing Office.
12          This hearing is being held pursuant to
13  the Individuals with Disabilities Education Act,
14  IDEA, 20 United States Code, §1415, (f) (1).
15  Today is Wednesday, June 9th, 2010.  I currently
16  have 10:49 a.m.  Prior to going on the record,
17  there was some off-the-record discussion between
18  myself and the parties.  I'd like everybody in
19  the room to identify themselves.  Ralph
20  Pennington, Hearing Officer.
21          MR. WILLIAM WOODS:  William Woods,
22  Administrator of Special Education for the
23  Children First Network, Number Five.
24          MR. AARON SCHEINWALD:  Aaron Scheinwald,

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax 212-227-7524

5

4

1   legal intern, Lincoln Square Legal Services.
2           MS. RACHEL WU:  Rachel Wu, legal intern,
3   of Lincoln Square Legal Services.
4           MS. KASI LEGRAND:  Kasi Legrand, Master
5   Social Work Fellow, Lincoln Square Legal
6   Services.
7           MS. LEAH HILL:  Leah Hill, Lincoln
8   Square Lincoln Services, appearing for ▇▇▇▇
9   ▇▇▇▇ (phonetic).
10          MS. ALEXANDRA ALVAREZ:  Alexandra
11  Alvarez, legal intern, for Lincoln Square Legal
12  Services.
13          HEARING OFFICER PENNINGTON, JR.:  Prior
14  to going on the record, there was off-the-record
15  discussion between myself and the representatives
16  for the parties, and it appears that an
17  independent evaluation was done on the subject
18  child, and reports just came in as of June 4 CSE
19  review was going to be held, and that will lead
20  to wherever the--
21          (Background noise)
22          HEARING OFFICER PENNINGTON, JR.:  The
23  CSE review will be held when?  Any kind of time
24  frame?
25          MR. WOODS:  We don't have a date, but I

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007-.
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

6

24    Children First Network, Number Five.
25    MR. AARON SCHEINWALD:  Aaron Scheinwald,

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone 212-227-7440 • 800-221-7242 • Fax 212-227-7524

24    frame?
25    MR. WOODS:  We don't have a date, but I

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone 212-227-7440 • 800-221-7242 • Fax 212-227-7524

5

1    have requested it expedited.
2    HEARING OFFICER PENNINGTON, JR.:  Okay.
3    And also an off-the-record discussion between
4    myself and the representative of the Department
5    is since this case is not even ready to go
6    forward as of today, he made a request for an
7    adjournment, and the request is going to be
8    granted.  We're going to adjourn this case.  Also
9    an off-the-record discussion between myself and
10   the representatives for the parent and then the
11   student, they're going to make an opening
12   statement.  And Miss--what is the name?
13   MS. ALVAREZ:  Alvarez.
14   HEARING OFFICER PENNINGTON, JR.:  She's
15   going first.  Miss Alvarez is going to go first.
16   Miss Alvarez, the floor is yours.
17   MS. ALVAREZ:  Thank you very much.  Good
18   morning, Your Honor, ladies and gentlemen.  Thank
19   you for accommodating us here today.
20   academic journey so far has been marked by
21   successive failures on the part of the Department
22   of Education.  Initially when he was referred to
23   special education in 2003, he was never provided
24   a comprehensive assessment in all areas of his
25   respective disabilities.  This failure to

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone 212-227-7440 • 800-221-7242 • Fax 212-227-7524

6

1    properly evaluate ____ put him on a road to
2    academic failure.  Year after year, ____ has
3    seen his peers and classmates continue on and
4    advance, as they should, while he is continually
5    frustrated in a system that's not meeting his
6    needs, but ____ is not the only one who's
7    frustrated.  His mother has been actively
8    involved in his education.  She has cooperated
9    with the Department of Education, and she knows
10   that her son needs help, and she wants him to get
11   help.  As a result, in 2009, when it was clear
12   that the IEPs were not working and that her son
13   was not progressing, she wrote a letter
14   requesting an evaluation.  To this day, that
15   letter has not been answered appropriately.  So
16   today and in the following days when we talk
17   about this case, we plan to show that the
18   Department of Education has failed to nurture
19   ____'s academic, social, and emotional needs.
20   So how did the Department of Education
21   fail ____  We have identified six points so
22   far where we see the DOE's neglect impacted his
23   education.  Between 2007 and 2009, the DOE never
24   provided ____ with a comprehensive assessment
25   in all areas of his suspected disability pursuant

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone 212-227-7440 • 800-221-7242 • Fax 212-227-7524

7

```
1    to Title A of the New York Comp Codes and
2    Regulations Section 200.4 §B.  As a result of
3    failing to provide ▆▆▆▆ with adequate
4    evaluations, his disability has not been
5    identified, and subsequent to that, he has not
6    been classified properly.  Additionally, we have
7    not received one single IEP that was developed
8    properly or implemented properly, and ultimately,
9    we have not yet seen ▆▆▆▆ receive the Free
10   Appropriate Public Education that he deserves.
11         We plan to show you at the next hearing
12   that the DOE has ignored numerous red flags
13   indicating that ▆▆▆▆ needs additional
14   evaluations.  Starting in 2005, the DOE noticed
15   ▆▆▆▆'s processing difficulties.  We will show
16   that they continue to identify the same
17   processing problem all throughout the years of
18   these IEPs, and they have yet to address them.
19         MS. WU:  We also intend to show that the
20   Department of Education--
21         HEARING OFFICER PENNINGTON, JR.:
22   (Interposing) Hold on.
23         MS. WU:  I'm sorry.  Shall we start
24   over?
25         HEARING OFFICER PENNINGTON, JR.:  Yeah,
```

8

```
1    go ahead.
2          MS. WU:  We also intend to show that the
3    Department of Education has failed to classify
4    ▆▆▆▆.  We will show that all his records have
5    numerous suggestions that he has ADHD that were
6    all ignored by the Department of Education.  The
7    Department of Education was clearly confused
8    about what kind of disability ▆▆▆▆ had.
9    Instead of giving him a comprehensive evaluation,
10   the just kept on giving him a variety of
11   classifications ranging from speech and language
12   impairment to mental retardation to the fictional
13   classification of mental deficient.
14         When an IEP is designed, the Department
15   of Education must take into account a student's
16   disability and all the educational needs that
17   result from his disability.  They must take in to
18   account an assortment of information to provide
19   an adequate IEP for the student so the student
20   can progress and advance.  This is not only the
21   appropriate way to develop an adequate IEP, but
22   it is required by the law.  Since ▆▆▆▆ has
23   never been properly classified or assessed, it
24   was impossible for the Department of Education to
25   ever develop an adequate IEP for him.
```

Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

9

1    Empirical social science studies show

2    that if a child's disability is unaddressed and

3    untreated, it can have detrimental effects on his

4    development lasting into his adulthood.  For

5    example, if ▆▆▆▆ did, in fact, have ADHD and

6    then went undiagnosed and untreated, it can have

7    severe affects on his cognitive, social, and

8    emotional development.  As a result of all these

9    failures, ▆▆▆▆ was denied a Free Appropriate

10   Public Education.  Under IDEA, every child is

11   entitled to a Free Appropriate Public Education.

12   In the Board of Education versus Riley

13   (phonetic), the Supreme Court established that

14   the state must comply with all the procedures set

15   forth in IDEA, and a program must be reasonably

16   calculated to confer educational benefits upon a

17   student.  All of ▆▆▆▆'s recent IEPs show that

18   there has been any progression.  In fact, there

19   has been regression.

20        All we're asking for is for the

21   Department of Education to provide services

22   including, but not limited to appropriate

23   tutoring services, and individualized attention

24   to help ▆▆▆▆ catch up to speed to the grade

25   level of his peers, and to compensate him for all

10

1    the years that he's been deprived of a Free

2    Appropriate Public Education.  ▆▆▆▆ is the

3    proverbial square peg in the round hole.  He's

4    never been able to comfortably fit or benefit

5    from all of these inadequate IEPs that were

6    developed for him throughout these years.  It is

7    one thing if your family and friends can't

8    identify what kind of disability you have.  It is

9    a completely different story when the Department

10   of Education, which has the resources, has the

11   knowledge to help every student advance and

12   develop socially and academically, fails and

13   refuses to help you throughout the years, and

14   this, ladies and gentlemen and Your Honor, is

15   what happened in ▆▆▆▆'s case.  Thank you.

16        HEARING OFFICER PENNINGTON, JR.:  Okay.

17   During off-the-record conversation between myself

18   and the representatives to the parties, the

19   Department's going to reserve their opening

20   statement for right now.  Evidence.  Let's go off

21   record.

22        (OFF THE RECORD)

23        (ON THE RECORD)

24        HEARING OFFICER PENNINGTON, JR.:  I'm

25   going to - - on the record.  Back on record.

11

1  While I was off record, there was a discussion

2  between myself and the representatives for the

3  parties with respect to the continuation of this

4  case, and this case is going to be continued to

5  July 8th, 10 a.m. And the compliance date is July

6  7. So why don't we adjourn it to July 8th? Do I

7  have a request to adjourn the compliance date?

8        (Laughter)

9        MS. WU: Yes.

10       MR. HILL: Yes.

11       HEARING OFFICER PENNINGTON, JR.: Okay.

12       (Crosstalk)

13       HEARING OFFICER PENNINGTON, JR.: --to

14  extend the compliance date. The compliance date

15  will be extended when it becomes due. With

16  respect to the evidence, there is no objections

17  by the Department. The Department is not

18  submitting any evidence at this particular time,

19  and I guess they'll submit evidence at a later

20  date and time, assuming that this case is going

21  forward. With respect to parent's evidence, we

22  have the following documents. Exhibit 1 is the

23  IEP of March 17th, 2007, 15 pages. Exhibit 2 is

24  the IEP of March 20th, 2008, 13 pages. Exhibit 3

25  is the IEP of November 13th, 2008, 13 pages.

12

1  Exhibit 4 is a 2008-2009 student report card, one

2  page, dated June 1st, 2009. Exhibit 5 is the

3  letter from--wait a minute. Let's go off record.

4        (OFF THE RECORD)

5        (ON THE RECORD)

6        HEARING OFFICER PENNINGTON, JR.: Okay.

7  Let's go back on record. Exhibit 5 is the letter

8  from ███████ (phonetic), one page, dated June

9  18th, 2009. Exhibit 6 is the 2009 social history

10  update, four pages, dated September 23rd of 2009.

11  Exhibit 7 is the 2009 teacher's progress report,

12  four pages, dated September 24th, 2009. Exhibit 8

13  is the 2009 Functional Behavioral Assessment,

14  identifying data teacher - - and parent

15  interview, seven pages, dated September 24th,

16  2009. Exhibit 9 is the 2009

17  psychological/education vocational assessments

18  reports, 17 pages, dated September 25th, 2009.

19  Exhibit 10 is the IEP of October 2nd, 2009, ten

20  pages. Exhibit 11 is the student progress

21  update, two pages, dated November 5th, 2009,

22  Exhibit 12 is the 2010 report card, one page,

23  dated March 12th, 2010. Exhibit 13 is the 2010

24  audiological exam results, one page, dated March

25  30th of 2010. Exhibit 14 is the 2010 speech

22 Cortlandt Street - Suite 802, New York, NY 10007
Phone 212-227-7440 • 800-221-7242 • Fax 212-227-7524

22 Cortlandt Street - Suite 802, New York, NY 10007
Phone 212-227-7440 • 800-221-7242 • Fax 212-227-7524

13

1    evaluation summary, six pages, dated March 29th,

2    2010.  Exhibit 15 is the 2010 speech evaluation

3    fall report, 13 pages, dated April 30th, 2009.

4    Exhibit 16 is the 2010 neuropsychological

5    evaluation report, six pages, dated May 1st, 2010.

6    All those documents will come into an Exhibit as

7    so duly noted.

8         (Whereupon Parents' Exhibits 1 through

9    16 were admitted into evidence.)

10         HEARING OFFICER PENNINGTON, JR.:  Also,

11   there were additional documents that were

12   submitted to the representative which may be re-

13   disclosed prior to the future hearing date, if

14   need be, and those will come into evidence at

15   that particular time.  Anything else?

16         MR. WOODS:  No.

17         HEARING OFFICER PENNINGTON, JR.:  Also

18   for the record, there's supposed to be a CSE

19   review, and according to the resolution

20   agreement, the CSE review is supposed to be held

21   within seven days of receipt of the evaluation,

22   which I believe according to Mr...

23         MR. WOODS:  Woods.

24         HEARING OFFICER PENNINGTON, JR.:  Woods,

25   is received on June 4th, so then the CSE, by my

14

1    calculations, should be done before June 15th,

2    2010.  So we're adjourned to July 8 of 2010 at 10

3    a.m.  Yes, Professor Hill?

4         MS. HILL:  Just one more thing for the

5    record.  I think the record should reflect that

6    the Department has not entered the Complaint, nor

7    has the Department submitted any documents as of

8    this date.

9         HEARING OFFICER PENNINGTON, JR.:  That's

10   correct.  And I don't know with respect to his

11   time whether or not he's still put in an Answer,

12   but he has time to--it says adjournment request,

13   so he still has time to put in evidence if we are

14   going to be proceeding, okay?  Anything else?

15   That concludes the hearing of ████████ Case

16   Number 125343.  And I have 11:09 a.m.  Thank you.

17         FEMALE VOICE:  Thank you, Your Honor.

18         MR. WOODS:  Thank you.

19         (Whereupon, at 11:09 a.m. the proceeding

20   was adjourned.)

15

C E R T I F I C A T I O N

I, Mare Ianniello, do hereby certify that I
typed the transcript In the Matter of ██████████
taken on June 9, 2010 by Racheal Cooper at the offices
of the Department of Education, 131 Livingston Street,
Brooklyn, New York, and that to the best of my
ability, this is an accurate transcription of what was
recorded at that time and place.

_____*Mare Ianniello*_____

MARE IANNIELLO, Transcriber

# EXHIBIT P

## RESOLUTION AGREEMENT

The following represents:

☑ An agreement in part reached between the parent and the New York City Department of Education Children First Network/5 (CFN) for District 3

Regarding the educational program(s) for:

Student Name: ▮▮▮▮▮▮▮

DOB:          November 26, 1996

The CFN and Parent agree to the following:

1. Meeting or Evaluation

| Type of Meeting or Evaluation | Expected Completion Date |
|---|---|
| CSE Review to consider additional information provided from independent evaluations | 7 school days after the completion and receipt of the independent evaluations (to the CSE review team) described in section 4. |

2. Services

| Service Type | Add/Drop | Frequency per week | Expected Implementation Date |
|---|---|---|---|
|  |  |  |  |

3. Placement or Program Change:

| Placement/Program Change FROM | Placement/Program Change TO | Expected Implementation Date |
|---|---|---|
|  | As per CSE review, the IEP developed and program recommendation will be implemented | Within 30 days of the CSE review. |

4.Other:

| Description of Item | Cost, if applicable | Frequency, if applicable | Expected Completion Date |
|---|---|---|---|
| Independent Evaluations (5) Speech, Audiological, Psychiatric, Neuropsych and Medical | As per DOE list. | NA | Prior to CSE Review |

Upon signing this agreement, the authorized assessment forms must be sent to the parent within 2-3 school days.

☑ To the extent the parties agreed to items identified above as a partial resolution of claims contained in the impartial hearing request, dated December 29, 2009 , and filed by the parent, this agreement is legally binding and is enforceable in any State court of competent jurisdiction or in a district court of the United States.

Either party may void this agreement in writing.   Voiding the agreement must be put in writing, forwarded to the CPN representative or parent, and postmarked within three (3) business days of the date of execution.

▬▬▬▬▬                                         William R. Woods, ASE
Parent (PRINT)                                DOE Representative (PRINT)

X ▬▬▬▬▬▬▬  ▬▬▬▬▬▬▬        William R. Wood , ASE
Parent (SIGN)                                 DOE Representative (SIGN)

Leah Hill                                     NA
Parent's Attorney or Advocate (PRINT)         Attorney for the DOE (PRINT)

                                              NA
Parent's Attorney or Advocate (SIGN)          Attorney for the DOE (SIGN)

Rachel Wu, Alexandra Alvarez
Parent's Legal Interns (PRINT)

Parent's Legal Interns (SIGN)

Dated:  February 23, 2010

# EXHIBIT Q

DEPARTMENT OF EDUCATION
Of the
CITY OF NEW YORK

------------------------

In the Matter of:

████████████            Case No.:  125343

----------------------X

                        District #3
                        131 Livingston St.
                        Brooklyn, NY 11201

                        Tuesday
                        September 21, 2010


        The above-entitled matter came on for hearing
at 10:15 a.m.


BEFORE:          RALPH PENNINGTON, JR.,
                 Impartial Hearing Officer

A P P E A R A N C E S :

For the Student:

LEAH HILL, ESQ., Attorney
████████████ Mother
BERNARD DUFRESNE, Legal Intern
SIOBHAIN MINAROVICH, Legal Intern
AARON SCHEINWALD, Legal Intern
TANYA COVINGTON, Children's Services
KATHERINE ACOSTA, Social Worker Intern

For the Department of Education:

NICHOLAS, CHAVARRIA, Director of Student Services

I N D E X

| WITNESS | DIRECT | CROSS | DIRECT | CROSS | D. | J |
|---------|--------|-------|--------|-------|-----|-----|
| ██████ | 27 | 33 | | | | 29 |

E X H I B I T S

| PARENT | DESCRIPTION | I.D. | IN EV. |
|--------|-------------|------|--------|
| None | | | |

| DEPARTMENT OF EDUCATION | DESCRIPTION | I.D. | IN EV. |
|---|---|---|---|
| *Exhibits 1 through 16 from 06/09/2010 hearing have been withdrawn and replaced as follows. | | | |
| 1 | Connor's Teacher's Rating Scale dated 2003, 4 pages | 23 | 25 |
| 2 | Social History, dated 2003, 3pages | 23 | 25 |
| 3 | Psycho-Educational Evaluation Dates of Evaluation: 01/12/2004 and 02/04/2004, 3 pages | 23 | 25 |
| 4 | Psycho-Educational Evaluation Dates of Evaluation: 01/12/2004 and 02/04/2004, 2 pages | 23 | 25 |
| 5 | Speech and Language Evaluation dated 2004, 4 pages | 23 | 25 |
| 6 | Structured Classroom Observation Record, dated 2004, 3 pages | 23 | 25 |
| 7 | IEP, dated 02/25/2004, 13 pages | 23 | 25 |
| 8 | IEP, dated 01/11/2005, 10 pages | 23 | 25 |

| DEPARTMENT OF EDUCATION   DESCRIPTION | | I.D. | IN EV. |
|----|----|----|----|
| 9 | Speech and Language Progress Report dated 03/01/2005, 1 page | 23 | 25 |
| 10 | IEP, dated 03/10/2005, 18 pages | 23 | 25 |
| 11 | Interim Service Plan, dated 2005 2 pages | 23 | 25 |
| 12 | IEP, dated 03/17/2006, 14 pages | 23 | 25 |
| 13 | IEP, dated 03/17/2006, 14 pages | 23 | 25 |
| 14 | IEP, dated 03/17/2007, 15 pages | 24 | 25 |
| 15 | IEP, dated 03/20/2008, 13 pages | 24 | 25 |
| 16 | IEP, dated 11/13/2008, 13 pages | 24 | 25 |
| 17 | Social History, dated 2009, 4 pages | 24 | 25 |
| 18 | Parent's Letter to Department of Education, 1 page | 24 | 25 |
| 19 | Teacher's Progress Report, dated 2009, 4 pages | 24 | 25 |
| 20 | Functional Behavioral Assessment dated 2009, 7 pages | 24 | 25 |
| 21 | Psycho-Educational Evaluation Date of Examination: 09/25/2009, 17 pages | 24 | 25 |
| 22 | IEP, dated 10/02/2009,12 pages | 24 | 25 |
| 23 | Audiological Evaluation Results dated 03/30/2010, 1 page | 24 | 25 |
| 24 | Speech Evaluation Summary dated 2010, 5 pages | 24 | 25 |
| 25 | Speech Evaluation Full Report dated 2010, 13 pages | 24 | 25 |
| 26 | Progress Reports, 4 pages | 24 | 25 |
| 27 | Psychiatric Report Date of Evaluation: 05/27/2010, 27 pages | 24 | 25 |

| DEPARTMENT OF EDUCATION   DESCRIPTION | | I.D. | IN EV. |
|----|----|----|----|
| 28 | Neuropsychological Evaluation Report Date of Evaluation: 04/26/2010, 10 pages | 24 | 25 |
| 29 | Results of BAT dated 08/18/2010, 1 page | 25 | 25 |

20

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | HEARING OFFICER RALPH PENNINGTON, JR.: |
| 3 | This is Ralph Pennington.  I've been designated |
| 4 | by the Impartial Hearing Office to hear the case |
| 5 | of ▮▮▮▮▮▮, Case Number 125343.  Today is |
| 6 | Wednesday, September the 21st, 2010.  I currently |
| 7 | have 10:15 a.m.  There was extensive off-the- |
| 8 | record conversation between myself and the |
| 9 | representatives for the parties.  Now I'm going |
| 10 | to go on record.  I'd like everybody in the room |
| 11 | to identify themselves.  Ralph Pennington, |
| 12 | Hearing Officer. |
| 13 | MR. NICHOLAS CHAVARRIA:  Nicholas |
| 14 | Chavarria, Director of Student Services with the |
| 15 | Department of Education. |
| 16 | MS. LEAH HILL:  Leah Hill, Lincoln |
| 17 | Square Legal Services, appearing for the parent. |
| 18 | MS. ▮▮▮▮▮▮▮▮▮, I'm |
| 19 | the parent of ▮▮▮. |
| 20 | MR. BERNARD DUFRESNE:  Bernard Dufresne, |
| 21 | legal intern, Lincoln Square Legal Services |
| 22 | representing the mother, ▮▮▮▮. |
| 23 | MS. SIOBHAIN MINAROVICH:  Siobhain |
| 24 | Minarovich, Lincoln Square Legal Services legal |
| 25 | intern on behalf of the mother, ▮▮▮▮. |

21

| | |
|---|---|
| 1 | MS. KATHERINE ACOSTA:  Katherine Acosta, |
| 2 | social work intern, Lincoln Square Legal |
| 3 | Services. |
| 4 | MR. AARON SCHEINWALD:  Aaron Scheinwald, |
| 5 | legal intern, Lincoln Square Legal Services. |
| 6 | MS. TANYA COVINGTON:  Tanya Covington, |
| 7 | Child Protective Specialist from the |
| 8 | Administration of Children's Services. |
| 9 | HEARING OFFICER PENNINGTON:  And your |
| 10 | name? |
| 11 | MR. CHAVARRIA:  Nicholas, Nick. |
| 12 | MS. HILL:  Can you spell your last name |
| 13 | please. |
| 14 | MR. CHAVARRIA:  C-H-A-V as in Victor-A- |
| 15 | R-R-I-A. |
| 16 | MS. HILL:  And say it so I can-- |
| 17 | MR. CHAVARRIA:  Chavarria. |
| 18 | MS. HILL:  Chavarria.  Chavarria.  Thank |
| 19 | you. |
| 20 | MR. CHAVARRIA:  Thank you. |
| 21 | HEARING OFFICER PENNINGTON:  Mr. |
| 22 | Chavarria, the floor is yours if you want to make |
| 23 | an opening statement, fine.  If you don't want to |
| 24 | make a statement, that's fine too. |
| 25 | MR. CHAVARRIA:  Okay.  I think my |

22

```
 1   statement is that I'm here to represent the
 2   Department of Education in this on-going case
 3   which was handed to me recently.  My
 4   understanding of the case is that the parent
 5   alleges that her child failed to receive adequate
 6   services through the Department of Education and
 7   that she feels that she's entitled to a free
 8   independent evaluations and compensatory services
 9   for lack of academic development in her son, in
10   both speech and language therapy and in reading
11   and general academic progress.  So I'm here to
12   represent the Department of Education on that
13   behalf.
14         HEARING OFFICER PENNINGTON:  With
15   respect to the evidence previously entered into
16   the record, were documents 1 through 16, those
17   documents are going to be withdrawn and now we
18   have essentially the same documents to some
19   degree with additional.  And the following
20   documents will be entered into the record,
21   Exhibits 1 through 29.  On the list, there's 1 to
22   31, but documents 30 and 31--well 30 is the
23   August 2010 IEP and it hasn't been turned over to
24   the parent's attorney yet.  And Exhibit 31 has
25   not been done yet.  With respect to Exhibit 1,
```

23

```
 1   that's Connor's Teacher's Rating Scale, 2003,
 2   four pages.  Exhibit 2 will now be the Social
 3   History from 2003, three pages.  Exhibit 3 is the
 4   Psycho-Educational Evaluation, three pages, that
 5   was done in 2004--dates of evaluation, January
 6   12th and February 4th of 2004.  Exhibit 4 is
 7   another Psycho-Educational Evaluation, two pages,
 8   same dates of evaluation.  Exhibit 5 is the
 9   speech and Language Evaluation for 2004, four
10   pages.  Exhibit 6 is the Structured Classroom
11   Observation Record and that's three pages, dated
12   2004.  Exhibit 7 is the IEP from February 25th,
13   2004, 13 pages.  Exhibit 8 is the IEP from
14   January 11th, 2005, 10 pages.  Exhibit 9 is the
15   Speech and Language Progress Report, it's just
16   one page--one page, date of report March 1st,
17   2005.  Exhibit 10 is the IEP from March 10th,
18   2005, 18 pages.  Exhibit 11 is the Interim
19   Service Plan for 2005, two pages.  Exhibit 12 is
20   the IEP from March 17th, 2006, 14 pages.  There
21   were two IEPs done on the same day?
22         MR. CHAVARRIA:  It may be a make-up, but
23   it's certainly two different IEPs.
24         HEARING OFFICER PENNINGTON:  Okay, it
25   looks like Exhibit 13 is the same date, looks
```

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

24

1   like another IEP, 14 pages.  Exhibit 14 is an IEP
2   from March 17th, 2007, 15 pages.  Exhibit 15 is
3   an IEP from March 20th, 2008, 13 pages.  Exhibit
4   16 is the IEP dated November 13th, 2008, 13
5   pages.  Exhibit 17 is the Social History from
6   2009, four pages.  Exhibit 18 is the Parent's
7   Letter to the Department of Education, one page.
8   Exhibit 19 is the Teacher's Progress Report,
9   2009, four pages.  Exhibit 20 is the Functional
10  Behavioral Assessment, 2009, seven pages.
11  Exhibit 21 is the Psycho-Educational dated 2009_
12  date of examine is September 25th, 2009, 17
13  pages.  Exhibit 22 is the IEP of October 2nd,
14  2009, 12 pages.  Exhibit 23 is the Audiological
15  Evaluation Results 2010_ dated March 30th of
16  2010, that's one page.  Exhibit 24 is the Speech
17  Evaluation Summary, 2010, five pages.  Exhibit
18  25, Speech Evaluation Full Report, 2010, 13
19  pages.  Exhibit 26, Progress Reports inclusive of
20  report card, progress report and another report
21  card, four pages.  Exhibit 27 is the Psychiatric
22  Report_ date of evaluation May 27th, 2010, that's
23  27 pages.  Exhibit 28, Neuropsychological
24  Evaluation Report, a total of 10 pages, date of
25  evaluation April 26th, 2010.  Exhibit Number 29

25

1   are the Results from the BAT, August 18th, 2010,
2   one page.  Any objections?  Any objections?
3        MR. DUFRESNE:  No objections.
4        HEARING OFFICER PENNINGTON:  Those
5   documents will come into evidence as so duly
6   noted.
7        (Whereupon, Department of Education
8   Exhibits 1 through 29 have been admitted into
9   evidence.)
10       HEARING OFFICER PENNINGTON:  Mr_
11       MR. DUFRESNE:  Dufresne.  Dufresne.
12       HEARING OFFICER PENNINGTON:  Dufresne?
13       MR. DUFRESNE:  Yes.
14       HEARING OFFICER PENNINGTON:  The floor
15  is yours.  My understanding the mother is going
16  to testify.
17       MR. DUFRESNE:  Yes, I'm just going to
18  ask her a few questions.
19       HEARING OFFICER PENNINGTON:  Okay.  Mom,
20  raise your right hand please.  Do you swear or
21  affirm to tell the truth, the whole truth and
22  nothing but the truth at this hearing?
23       ███████: ███
24       HEARING OFFICER PENNINGTON:  Spell your
25  full name for the record please.

26

| 1 | MS. ███████: My full name? |
| 2 | HEARING OFFICER PENNINGTON: Yes. |
| 3 | MS. ███████ ████████, my name is- |
| 4 | -Maria is ████████ last name ████████ ███████ |
| 5 | ███████ |
| 6 | HEARING OFFICER PENNINGTON: Okay and |
| 7 | your relationship to the student? |
| 8 | MS. ███████ Is the mother. |
| 9 | HEARING OFFICER PENNINGTON: And Mr. Du- |
| 10 | - |
| 11 | MR. DUFRESNE: Dufresne. |
| 12 | HEARING OFFICER PENNINGTON: (Laughter) |
| 13 | Dufresne, is going to ask you some questions on |
| 14 | direct examination. Answer them from your |
| 15 | personal knowledge and recollection. If you need |
| 16 | to refer to any documents, ask me to do so before |
| 17 | doing so. Mr. Chavarria_ is it close? |
| 18 | MR. CHAVARRIA: That was good. |
| 19 | HEARING OFFICER PENNINGTON: (Laughter) |
| 20 | Okay. He may ask you some questions on cross- |
| 21 | examination. I may jump in periodically and ask |
| 22 | you some questions. And if you hear an |
| 23 | objection, pause, I have to make a ruling. And |
| 24 | if I the answer is I don't recall or I don't |
| 25 | know, then so be it. Floor is yours. |

27

| 1 | MR. DUFRESNE: Thank you. |
| 2 | HEARING OFFICER PENNINGTON: Counsel or |
| 3 | Counsel-to-be. (Laughter) |
| 4 | MR. DUFRESNE: (Laughter) Ms. ███████ |
| 5 | thank you. In talking about your son, ███████ |
| 6 | when did you first notice that he was having |
| 7 | issues at school? Around what age? |
| 8 | MS. ███████ Around age, like, six or |
| 9 | seven. |
| 10 | MR. DUFRESNE: Were there things that he |
| 11 | would tell you? Was it more so his grades or |
| 12 | things you heard from him or from teachers? |
| 13 | MS. ███████: I heard more from the |
| 14 | teachers. |
| 15 | MR. DUFRESNE: Okay. What were some of |
| 16 | their reactions? |
| 17 | MS. ███████ That he wasn't listening |
| 18 | real good and he wasn't attending what the |
| 19 | teachers saying. And - - the teacher call me |
| 20 | that they have to do a evaluation because they |
| 21 | think he's got something else. So they told me |
| 22 | to go a social worker from the school. From |
| 23 | there they do the evaluation and all that, they |
| 24 | tell me they have to do some evaluations from |
| 25 | there. They give me some--but from there he got |

28

```
 1    the problem to go to a small class and all that.
 2         MR. DUFRESNE:  Did the school ever tell
 3    you exactly what was wrong with ████████
 4         MS. ███████:  No.
 5         MR. DUFRESNE:  What were some of the
 6    things that you remember?
 7         MS. ████████:  The school tell me that he
 8    be not listening to--attend to the teacher.  The
 9    teacher see that he wasn't trying to listen.  He
10    trying, but he wasn't really into it.
11         MR. DUFRESNE:  Okay.  In your experience
12    with him at home, is he a hard worker?  He comes
13    home and does his homework?  Or_?
14         MS. ████████:  He do his homework, but
15    it's hard to do it for him.
16         MR. DUFRESNE:  Okay.
17         MS. ████████:  I try my best.  But he try
18    to do the stuff, but he knows it, but he try to
19    be focused, but he don't.  So I try to help him.
20    So when I try to help him, the thing is he gets
21    stressed, I get stressed.
22         MR. DUFRESNE:  Mm-hmm.
23         MS. ████████:  Because he don't
24    understand the words that the teacher does or
25    whatever, math, whatever.  So we try together,
```

29

```
 1    but he gets so frustrated.  So like that, we try
 2    our best.  So he understand this.  So I leave it
 3    alone, like that, he don't get stressed.
 4         HEARING OFFICER PENNINGTON:  Does that
 5    happen every day?
 6         MS. CARRION:  Every single day.
 7         HEARING OFFICER PENNINGTON:  How long
 8    does it take him to do the homework?
 9         MS. ███████:  Without lying, he comes
10    from school, five or six hours.
11         HEARING OFFICER PENNINGTON:  It takes
12    him five or six hours to do the homework?  Is
13    that every day?
14         MS. ████████:  Every single day.
15         HEARING OFFICER PENNINGTON:  Does he do
16    his homework every day?
17         MS. ████████:  He does his homework every
18    single day.  Like I told the teacher, I try my
19    best.
20         HEARING OFFICER PENNINGTON:  Mm-hmm.
21         MS. ████████:  Because some homework is
22    hard for him, I understand that.
23         HEARING OFFICER PENNINGTON:  Mm-hmm.
24         MS. ████████:  You know, like, - - like,
25    algebra.  You know, it's hard to understand it.
```

30

1  So I explain to him, like five times.  He knows
2  one part, but the other part that he don't
3  understand.
4      HEARING OFFICER PENNINGTON:  Mm-hmm.
5      MS. ███████:  So I try with him.  He
6  gets so – –, you know, so stressed.  "Mommy, I
7  try my best."  So I say, just try what you
8  understand.  So we keep on it, we keep on.  So he
9  still don't understand it.
10      HEARING OFFICER PENNINGTON:  Mm-hmm.
11      MS. ██████  I try my best to do his
12  homework how he understand it.
13      HEARING OFFICER PENNINGTON:  Is this
14  primarily because he's struggling with reading?
15      MS. ██████  I don't know.  Maybe it is
16  because it's too much things that he understands.
17      HEARING OFFICER PENNINGTON:  Mm-hmm.
18      MS. ██████:  Words that he understands,
19  like they put – –, something like that.  He knows
20  the word, but he don't know what the meaning.
21      HEARING OFFICER PENNINGTON:  Mm-hmm.
22      MS. ██████:  So I need to explain to
23  him what the word means.  So if he kept it in his
24  brain.
25      HEARING OFFICER PENNINGTON:  Mm-hmm.

31

1      MS. ██████:  So he don't kept it, so
2  it's stress for him.
3      HEARING OFFICER PENNINGTON:  What's the-
4  -does he speak Spanish?
5      MS. ██████:  He speaks Spanish and
6  English.
7      HEARING OFFICER PENNINGTON:  What's the
8  primary language that's spoken in the house?
9      MS. ██████  At my house, we speak
10  English.  My parents speak in Spanish.
11      HEARING OFFICER PENNINGTON:  Okay.
12      MR. DUFRESNE:  Has ██████ mentioned
13  anything about not understanding the schoolwork
14  or not understanding what the teacher is saying
15  to him?  Or not understanding the actual--
16      MS. ██████:  (Interposing)  Yes.
17      MR. DUFRESNE:  --math or the English or
18  the reading?
19      MS. ██████:  Yes.  The teacher--he got
20  an afterschool thing that the teacher help him.
21  The teacher tell me too, that she – – to teach
22  him too because he understands it, but he tries
23  his best to understand it.  So she don't get
24  stressed and he don't get stressed.  Well,
25  because if he gets stressed, he get upset, he get

1    mad and he leave because he don't understand it.

2          MR. DUFRESNE:  In the past, you know,

3    five or six years that he's been getting these

4    type of services of some sort, what kind of

5    progress have you seen?  If any.

6          MS. ███████:  None, none.

7          MR. DUFRESNE:  We know you wrote a

8    letter last June to the Department of Education

9    asking for him to be reevaluated in a smaller

10   classroom.  Did you hear back from the Department

11   of Education?

12         MS. ██████:  No.

13         MR. DUFRESNE:  Okay.  What would you

14   like most for ████████ in terms of his school, his

15   academic development?

16         MS. ████████  What I want most for son

17   is like, he know more better, be in a small

18   class, because right now he's in a 23 student

19   with two teachers.  And the two teachers have to

20   - - the whole 23.  They cannot be - - like

21   Enrique.  So I want a small class that he

22   understands the stuff, he cannot be stressed.

23   That's what I want for him and that he can be

24   comfortable with the teacher, comfortable with

25   the school, not be fighting everyday, I hate this

1    school, I can't understand it.  I want him to be

2    comfortable in one school, in a small class that

3    he can learn more better.  That he's got speech,

4    counselor, language--all the stuff that he needs.

5          MR. DUFRESNE:  Okay.  With his August

6    2010 IEP, do you know if there have been any

7    changes for the past three weeks now that school

8    has started?

9          MS. ███████  None.

10         MR. DUFRESNE:  Okay.  So you haven't

11   seen anything different the beginning of this

12   school year from last school year, despite a new

13   IEP?

14         MS. ████████:  No.

15         MR. DUFRESNE:  Okay.  Would you like to

16   be more involved in the IEP process and get

17   feedback and be in contact with more teachers and

18   things like that?

19         MS. ███████:  Yes.

20      .   MR. DUFRESNE:  Okay.  We have nothing

21   further.

22         MS. COVINGTON:  I just have a few

23   questions.  You said a number of times that he

24   doesn't understand.  Have you had the experience

25   of trying to tell him or get him to do something

34

1    at home not related to school where he also

2    doesn't understand?  Can you talk about that?

3            MS. ████: Yeah, I got problems with

4    him at home too, that you tell him to wash his

5    clothes like 20 times.  He understands it, you

6    have to speak it again.  ████ wash your

7    clothes please.  He tell you later, but it's like

8    once its through his ear, it goes to the other

9    ear.

10           MS. COVINGTON:  What about how he

11   communicates with you?  I know you--?

12           MS. ████: (Interposing)  We be

13   fighting.  We be--

14           MS. COVINGTON:  (Interposing)  Let me

15   finish the question.  (Laughter)  Have there been

16   times when he has tried to communicate something

17   and how does he communicate something to you?

18           MS. ████: He communicates, sometimes

19   he forget the stuff and sometimes not.  Sometimes

20   he wants to explain me the stuff that he feel,

21   but he forget the stuff, what he going to say.

22           MS. COVINGTON:  Oh, so he has moments of

23   spacing out?  Would you describe it as spacing

24   out?

25           MS. ████: Yes.

35

1            MS. COVINGTON:  What about him repeating

2    things?  Does he repeat things?

3            MS. ████: Yes.

4            MS. COVINGTON:  Why don't you give us an

5    example of that.

6            MS. ████: Like he want to tell you,

7    like, I want that cookie.  He'll keep on, cookie,

8    cookie, cookie, cookie.  I understand you; it's a

9    cookie.  But he keep on saying the same thing and

10   he thinks he's doing another word, but he keep on

11   saying the same word.

12           MS. COVINGTON:  Anything else you want

13   to add to what you've said already?

14           MS. ████: No.

15           MS. COVINGTON:  Do you find him having

16   more difficulty with one subject or another?  Is

17   he good in any subject?

18           MS. ████: He's good in math.

19           MS. COVINGTON:  Okay.

20           MS. ████: In math, he loves math.

21   But the other - -, his grades down.  Let me put

22   it like that, his grades down.

23           MS. COVINGTON:  When you say they're

24   down, what do you mean?  Is he passing?

25           MS. ████: He's not passing.

36

| | |
|---|---|
| 1 | MS. COVINGTON:  He's failing? |
| 2 | MS. ██████  He's failing. |
| 3 | MS. COVINGTON:  And that's at the end of |
| 4 | this school year? |
| 5 | MS. ██████  Yeah, like, I speak with |
| 6 | Ms. Blanca (phonetic). |
| 7 | MS. COVINGTON:  Who is? |
| 8 | MS. ██████  That's from the school. |
| 9 | MS. COVINGTON:  Mm-hmm. |
| 10 | MS. ██████  So she tell me that he got |
| 11 | one in English. |
| 12 | MS. COVINGTON:  An exam? |
| 13 | MS. ██████  Yes. |
| 14 | MS. COVINGTON:  Anything else that she |
| 15 | told you about his grades? |
| 16 | MS. ██████  That's all that she told |
| 17 | me, about one only grade. |
| 18 | MS. COVINGTON:  Okay.  No further |
| 19 | questions. |
| 20 | MR. DUFRESNE:  No further questions. |
| 21 | HEARING OFFICER PENNINGTON:  Mr. |
| 22 | Chavarria. |
| 23 | MR. CHAVARRIA:  I have no questions. |
| 24 | HEARING OFFICER PENNINGTON:  All right, |
| 25 | thank you.  Okay.  Let's go off record. |

37

| | |
|---|---|
| 1 | (OFF THE RECORD) |
| 2 | (ON THE RECORD) |
| 3 | HEARING OFFICER PENNINGTON:  All right, |
| 4 | while we were off the record, there was |
| 5 | discussion between myself and the representatives |
| 6 | for the parties, essentially the case is |
| 7 | finished.  I'm giving the parent's |
| 8 | representatives time to prepare a closing |
| 9 | statement, the Department can also prepare if |
| 10 | they so choose, a written closing statement.  How |
| 11 | much time do you need?  Well, let's go off |
| 12 | record. |
| 13 | (OFF THE RECORD) |
| 14 | (ON THE RECORD) |
| 15 | HEARING OFFICER PENNINGTON:  While we |
| 16 | were off the record, we were discussing what date |
| 17 | that the closing briefs--closing statement would |
| 18 | be due, and that will be due on November 5th of |
| 19 | 2010.  I guess I have a request to extend the |
| 20 | compliance when it becomes so due? |
| 21 | MS. HILL:  Yes. |
| 22 | HEARING OFFICER PENNINGTON:  Okay.  So |
| 23 | the compliance will be extended when it becomes |
| 24 | due.  And that's it.  Anything else? |
| 25 | MS. HILL:  Just that the record remain |

38

```
 1    open in terms of us being able to submit any
 2    additional documents.
 3              HEARING OFFICER PENNINGTON:  Oh, for the
 4    record also, in conjunction with the written
 5    closing statement and the written closing briefs,
 6    I'm going to allow the parent's representatives
 7    to also submit additional documents which may
 8    come in after we close the hearing today.  In
 9    particular, the August 2010 IEP and also the
10    Central Auditory Processing Evaluation and any
11    other documents or evaluations which the parent's
12    representatives feel are material and/or relevant
13    to this proceeding.  When you do that, just make
14    sure you give him a copy and see if he has any
15    objections.
16              MS. HILL:  Okay.
17              MR. DUFRESNE:  Sure.
18              HEARING OFFICER PENNINGTON:  Okay, so
19    you can just E-mail it or send it to the Case
20    Manager.
21              MR. DUFRESNE:  Okay.
22              HEARING OFFICER PENNINGTON:  Okay,
23    anything else?  That concludes the hearing of
24    ██████████ Case Number 125343.  And I have
25    11:12 a.m.  Thank you.
```

39

```
 1              (Whereupon, at 11:12 a.m. the proceeding
 2    was concluded.)
```

40

<u>C E R T I F I C A T I O N</u>

      I, Michelle Gartung, do hereby certify that I typed the transcript In the Matter of ██████████ taken on September 21, 2010 by Terrance McLean at the offices of the offices of the Department of Education, 131 Livingston Street, Brooklyn, New York 11201, and that to the best of my ability, this is an accurate transcription of what was recorded at that time and place.

             *Michelle Gartung*

             MICHELLE GARTUNG, Transcriber

# EXHIBIT R

# In the Matter of ███████████

# Closing Statement

**Case No: 125343**                                                **November 5, 2010**
**District # 3**
**131 Livingston Street**
**Brooklyn, NY 11201**

**Submitted by: Lincoln Square Legal Services, Inc.**
**for The Parent**

## I.    PRELIMINARY STATEMENT

██████████ ("the Parent"), contends that the New York Department of Education, District 3 ("the District") failed to provide her thirteen year old son████████████████ with a free, appropriate public education ("FAPE") pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C.A. § 1414 et seq. (effective July 1, 2005) and N.Y. COMP. CODES. R. & REGS. tit. 8, § 200.5(j)(4)(ii) (2009) by failing to (1) properly identify████████ disability; (2) properly classify██████ in 2007, 2008 and 2009; (3) provide██████with an adequate evaluation in developing his Individualized Education Program ("IEP") in 2007, 2008 and 2009; (4) develop an adequate IEP for██████ and; (5) properly implement████████s 2008 and 2009 IEPs.  The evidence presented by the Parent includes the submission of twenty-nine documents and the testimony of the Parent which together overwhelmingly support a finding that the District failed to provide██████with a FAPE.  The District failed to meet its burden of production and persuasion pursuant to N. Y. Education Law (Educ. Law § 4404[1][c], as amended by Ch. 583 of the Laws of 2007) by failing to submit a response to the complaint as required by § 200.4(b)(4), and failing to introduce *any* evidence or witnesses at the impartial hearing.  Consequently the Parent's complaint should be sustained and the following relief be granted in its entirety, directing the District to:

(1) issue a related services authorization ("RSA") for██████ to receive a minimum of 198 hours of make-up services in the form of intensive speech and language therapy to compensate for missed services;

(2) provide 360 hours of intensive one-on-one reading and writing instruction by a provider trained in methods of instruction uniquely tailored to██████ needs;

(3) direct the Committee on Special Education ("CSE") to reconvene to create a new IEP for ██████ consistent with the above referenced provisions and providing for a deferral to the Central Based Support Team ("CBST") to place ██████ in an appropriate nonpublic school setting, with transportation as required.  Lincoln Square Legal Services, Inc. ("LSLS") proposes the School for Language and Communication Development ("SLCD") as one such appropriate nonpublic school setting providing programming uniquely suited to ██████'s needs as a child with severe language and communication disorders and concomitant psychiatric and intellectual challenges.

### A.    *Procedural History*

The Parent, by her attorney, LSLS filed a due process complaint on behalf of her thirteen year old son, ██████ on November 20, 2009 pursuant to the IDEA Act, 20 U.S.C.A. §§ 1400 et seq. and §§ 200 et seq.

In February 2010, the District and the Parent[1] entered into a Partial Resolution Agreement for comprehensive, independent, evaluations of ██████ to be conducted, at public expense and for the CSE to be reconvened following their completion.

An impartial hearing commenced on June 9, 2010 with LSLS presenting opening statements and submitting a number of exhibits into evidence.  The District offered no statement, evidence or arguments and the hearing was adjourned to September 21, 2010.  Prior to the adjourned date, the CSE reconvened on August 10, 2010 without notifying LSLS, the attorney on record and before the completion of all the comprehensive evaluations mandated in the Partial Agreement.

---

[1] The agreement was negotiated by the District and LSLS, as attorney of record for the Parent.  Both the Parent and LSLS signed off on the Agreement.

When the parties appeared before the Impartial Hearing Officer ("IHO") Ralph

Pennington on September 21, 2010, the District again offered no evidence in opposition to the

Parent's complaint. The Parent withdrew the previously submitted exhibits and submitted

twenty-nine exhibits into evidence. In addition, the Parent testified in support of the complaint.

At the conclusion of the hearing, the IHO instructed the parties to submit closing statements on

or before November 5, 2010 and left the record open to allow for the submission of additional

documents by either side on that date. Accordingly, the Parent submits ██████'s August 2010

IEP as Exhibit 30 and this statement summarizing the testimony and documentary evidence in

support of her complaint.

### B.    *Statement of Facts*

In the Fall of 2003, ██████ was initially referred to the CSE, where ██████'s school

social worker noted "speech and language deficits which seem to be adversely affecting his

overall academic performance ... student does not seem to understand when spoken to and he

seldom speaks in complete sentences." (Ex. 2 at p. 1). Since first being classified with a "speech

and language impairment" in 2004 (Ex. 7), ██████'s classification changed seven times. During

this time, ██████'s evaluations and progress reports showed that he was suffering from severe

language delays and was lagging in reading comprehension, spelling and speaking. (Ex. 9 at p. 1;

Ex. 10 at p. 6; Ex. 12 at p. 4; Ex. 14 at p. 4; Ex. 22 at p. 3). Despite these varying classifications

and until this year, evaluations in all areas of ██████'s suspected disability were never

conducted, even though there was ample evidence that ██████'s specific disability had not been

identified and ██████ was not progressing. On several occasions, ██████ was classified as

"mentally deficient" (Ex. 12; Ex. 14; Ex. 15), a non-existent classification under the applicable

federal and state regulations. Ultimately, because ██████'s disability could not be accurately

determined, an IEP could not be tailored to his individual needs. Failing to develop an appropriate IEP, the District failed to provide a free, appropriate public education reasonably calculated to confer educational benefit. As set forth below, the record is replete with evidence of ████'s lack of progress as painful confirmation of the denial of FAPE in this case.

## II.   THE DISTRICT FAILED TO PROVIDE ████ WITH A FREE, APPROPRIATE PUBLIC EDUCATION.

The District failed to provide ████ with a free, appropriate public education in each of the school years identified in the complaint—2007, 2008, 2009. "[P]rocedural inadequacies that cause substantive harm to the child or his parents-meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP-constitute a denial of a FAPE." Matrejek v. Brewster Cent. Sch. Dist., 471 F.Supp.2d 415, 419 (S.D.N.Y. 2007), aff'd, 293 Fed.Appx. 20 (2d Cir. 2008). As will be shown below, the District committed numerous procedural violations, specifically by failing to properly evaluate ████, failing to properly classify ████, failing to follow procedural guidelines in developing ████'s IEPs, and by failing to properly implement those IEPs. These procedural inadequacies caused substantive harm to ████ evidenced by his consistent lack of educational progress, and resulted in a lack of educational opportunity, and seriously infringed the Parent's participation in the IEP process. Therefore, the IHO must find that the District failed to provide a free, appropriate public education.

**A.**   ***The District consistently failed to comply with the procedural requirements mandated by law.***

    **1.**   **The District failed to properly evaluate** ███████.

The District failed to comply with the evaluation requirements outlined in the IDEA from 2007-2009.  Notably, this failure dates back to the time when ███████ was initially referred to the CSE in the Fall of 2003 and continued up to the time of the filing of the complaint.  When ███████ was initially referred to the CSE, the District failed to conduct a physical examination or an individual psychological evaluation as required by § 200.4 (b)(1)[2].  Furthermore, the District failed to conduct a comprehensive speech and language evaluation despite the fact that the school social worker noted in the initial referral to the CSE that there were "speech and language deficits which seem to be adversely affecting his overall academic performance . . . student does not seem to understand when spoken to and he seldom speaks in complete sentences." (Ex. 2 at p. 1).  This failure stands in direct contradiction to the law's mandate that the CSE test any area of the child's suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, *communicative status*, and motor abilities. 34 CFR 300.532[g] (*emphasis added*).  While acknowledging that the claims referring to the District's *initial* failures are no longer viable, LSLS seeks to demonstrate a continued trend of the District's failures to adequately address ███████'s needs dating back to 2003.

In 2006, the District failed to conduct a reevaluation of ███████ because it failed to review existing data that strongly suggested his needs were not being adequately addressed.  The March 2006 IEP stated that ███████ "presents with receptive and expressive language disorder characterized by reduced auditory memory processing skills . . . ." (Ex. 12 at p. 4).  According to

---

[2] An individual psychological evaluation and physical examination are mandated unless a school psychologist assessed the child and determines an evaluation is unnecessary.  No such assessments were conducted in this case.

§ 200.4(b)(4), the CSE must arrange a reevaluation if it is determined that the educational needs of the student, including academic needs and performance warrant a reevaluation. At this point, it should have been evident to the District that ████'s needs were not being met and a reevaluation was warranted. However, in anticipation of his next IEP, there was no evaluation done to determine the cause of this reduced memory/processing. Instead, ████'s classification was changed from "mentally retarded" to "mentally deficient". Another central purpose of the reevaluation process is to determine what additional data is needed to determine whether additions or modifications of service are needed to allow the student to meet annual goals in the IEP. IDEA Act, 20 U.S.C.A. § 1414 (c)(1)(B)(iii). ████ was not progressing and without reevaluations, it was not possible to determine what change in services was needed.

In 2007, three years after ████'s initial evaluation, there is no evidence in the record that the District complied with IDEA's mandate that a student with a disability be reevaluated at least once every three years by a multidisciplinary team that is thorough enough to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disability. § 200.4(b)(4)(vi). This failure to reevaluate ████ within three years of his initial evaluation constitutes a *prima facie* failure by the District to properly evaluate ████ and its historical significance in foretelling ████'s abysmal educational status is clear.

████'s November 2008 IEP notes the same language, communication and auditory processing deficits evidenced for many years and identified two years earlier in strikingly similar language—"████ has difficulty understanding spoken directions at the single step through multi-step levels." (Ex. 16 at p. 4). Incredibly, the November 2008 IEP also recommended a "Central Auditory Process Disorder evaluation" be conducted and yet none was performed. (Id.). At this point, the District had created seven IEPs for ████ and classified him with various

7

disabilities, further indication that ████ had not received sufficiently comprehensive

evaluations to identify *all* of his special education needs as mandated in § 200.4(b)(6)(ix).

### 2.   The District failed to properly classify ████

On March 1, 2005, the District conducted a Speech/Language Progress Report that stated

that ████ had "[s]evere receptive language delays and moderate to severe expressive language

delay." (Ex. 9). Strangely, ████'s subsequent IEP, dated March 10, 2005, classified him as

"mentally retarded," (Ex. 10 at p. 5), defined as "significantly subaverage general intellectual

functioning, existing concurrently with deficits in adaptive behavior and manifested during the

developmental period, that adversely affects a student's educational performance." §

200.4(zz)(7). There is nothing in the record to indicate why ████'s classification was

changed from "speech and language impairment" to "mental retardation". Most telling, the

record is devoid of the requisite tests or evaluations documenting that ████ exhibited

significantly subaverage intellectual functioning or adaptive behavior deficits in line with the

elements of "mental retardation". Courts have held that the Board of Education bears the burden

of establishing the appropriateness of the classification recommended by the CSE (Application

of a Child with a Handicapping Condition, Appeal No. 91-11; Application of a Child with a

Handicapping Condition, Appeal No. 92-37; Application of a Child Suspected of Having a

Disability, Appeal No. 94-8; Application of a Child with a Disability, Appeal No. 94-16). The

District failed to meet its burden because it did not offer any explanation for the classification.

Similarly, the District failed to properly classify ████ by repeatedly classifying him as

"mentally deficient" (Ex. 12 at p. 1; Ex. 14 at p.1; Ex. 15 at p. 1), a non-existent classification

under applicable state *and* federal law. According to § 200.4(d)(2)(ii), "[t]he IEP shall indicate

the classification of the disability pursuant to section 200.1(mm) or (zz) of this Part." That

section lists thirteen classifications of disabilities, none of which are "mentally deficient". The District's failure to classify ▇▇▇ with a valid disability constitutes a prima facie failure to properly classify ▇▇▇ Without a legally identifiable classification of disability, the District is patently unable to provide appropriate services to ▇▇▇ to allow him to progress academically.

>   **3.      The District has continuously failed to follow mandated procedures in developing ▇▇▇'s IEPs.**

Since 2007, the District has consistently violated the statutory and regulatory mandates governing the development of an IEP by failing to include a valid classification, failing to include necessary measurement tools, failing to include dates for progress reports to be sent to the parent, failing to properly compose the IEP/CSE team, failing to provide proper notice to the parent, and perhaps most importantly, failing to consider parental input.

▇▇▇'s March 2007 and March 2008 IEPs improperly identify his classification as "mentally deficient", a category that does not exist in IDEA or state law. (Ex. 14 at p. 1; Ex. 15 at p. 1). Under implementing state regulations "[t]he IEP shall indicate the classification of the disability pursuant to section 200.1(mm) or (zz) of this Part." § 200.4(d)(2)(ii) . As previously discussed, "mentally deficient" does not exist as a classification under the applicable portions of the law. Supra pp. 8-9. This made-up classification is a direct violation of the statutory requirement.

Neither the March 2007, November 2008, or October 2009 IEPs included measurement tools for the annual goals *or* any mention of periodic reports on progress to be sent to the parent. (See Ex. 14; Ex. 16; Ex. 22). Furthermore, the March 2008 IEP included what appears to be an attempt at specifying evaluative criteria but the progress section is already completed with

measures of progress from the previous year's performance. (Ex. 15 at pp. 7-8). Not only does this not meet the statutory requirements of § 200.4 but it is illogical and confusing. A closer examination of the 2007 and 2009 IEPs reveals annual goals that are too generic and vague to reflect ███████'s individual needs. Further, the measurement tools and progress report requirements are essential for both the school and the parent to monitor the child's progress or lack thereof and, as such, they are critical to ensuring the success of the IEP and the continued educational growth of the student.

In March 2007, the IEP team was also not properly composed. When developing an IEP, the team doing so must be composed of a number of people including the (1) parent, (2) not less than one general education teacher, (3) not less than one special education teacher, (4) a representative of the local educational agency, and (5) an individual who can interpret evaluation results. IDEA Act, 20 U.S.C.A. § 1414(d); § 200.3(a)(1). In March 2007, the only people listed at the IEP meeting are a general education teacher and a "bilingual speech and language" individual (presumably authorized to interpret evaluation results). (Ex. 14 at p. 2). There was no special education teacher present or a representative from the local educational agency. (Id.). There was obviously a rationale behind the legislature's decision to mandate that the aforementioned people compose an IEP team. Disregarding this and developing an IEP with fewer people than the law requires constitutes an inadequate development of an IEP and renders the 2007 IEP invalid.

The mandatory composition of the IEP team also reflects the law's preference for parent participation at an IEP meeting. See § 200.5(c)(d). Parents must receive at least five days prior notice to an IEP meeting being held; the notice should explicitly lay out the purpose and details of the meeting; the parent's schedule must be accommodated to allow attendance; and if the CSE

10

is unable to convince a parent to attend an IEP meeting, a record of the attempts must be preserved. § 200.5(c)(d). These provisions were also violated when developing ████'s IEPs. The March 2007 IEP indicates no attempts to notify the parent of the meeting or any follow-ups to ensure the date was agreeable. (Ex. 14 at p. 2). The March 2008 IEP indicates only one notice sent to the parent with no follow-up. (Ex. 15 at p. 2). Not surprisingly, in these instances where the Parent did not receive proper notice, both March 2007 and 2008, the parent did not attend the IEP meeting. (Ex. 14 at p. 2; Ex. 15 at p. 2).

Moreover, without the presence of the parent at these IEP meetings, the District could not possibly comply with the statutory requirement of parental input. In developing the IEP both federal and New York State law mandate that the IEP team consider "the concerns of the parents for enhancing the education of their child". IDEA Act, 20 U.S.C.A. § 1414(d); § 200.5(c)(d). At both the March 2007 and March 2008 IEP meetings the parent was not present. (Ex. 14 at p. 2; Ex. 15 at p. 2). As such, this crucial piece of input was definitively missing. On its own, this lack of an essential element should be enough to show the procedural failures of the District in adequately developing an IEP for ████ and certainly when coupled with the various other blatant statutory violations, there can be no doubt that the District failed to properly develop an adequate IEP for ████.

**4.    The District failed to properly implement ████'s IEPs.**

The District failed to meet their statutory responsibility to ensure that ████ receive the services recommended on his IEPs. "The school district shall ensure that the recommendations on a student's IEP . . . are implemented . . . . The school district must provide special education and related services to a student with a disability in accordance with the student's IEP . . . ." § 200.4(e). ████'s IEPs include several sessions of related services, including speech and

language therapy and counseling sessions.  The District has offered no evidence to show that ███████ received these mandated services.  The services were to be provided in a "separate location" (Ex. 14 at p. 15; Ex. 15 at p. 13; Ex. 16 at p. 12; Ex. 22 at p. 12) but the record does not contain the requisite RSA that would allow for or provide such services in a separate location. ███████'s severe lack of progress indicates that either ███████ was not receiving these services or they were not adequate to meet his needs. (Ex. 14 at p. 4).  For example, while ███████s March 2008 IEP acknowledges some progress in language skills, it goes on to state that he "continues to struggle" and details in length ███████'s various difficulties with speech and language. (Ex. 15 at p. 4).

### 5.    Procedural failures by the District continued after the filing of the complaint.

Since the filing of the complaint in this matter, the District has continued to disregard their obligations under the law.  The continual failures of the District are demonstrated in the most recent August 2010 IEP. (Ex. 30).  In developing this IEP, the District did not take one of the most recent evaluations, a neuropsychological exam conducted in April 2010, into consideration.  "In developing the recommendations for the IEP, the committee must consider the results of the initial or most recent evaluation . . . ." § 200.4(d)(2).  There is no indication however that this evaluation was taken into consideration.  The evaluation is not cited anywhere in the IEP and the recommendations are not adopted.

Moreover, it was improper for the CSE to classify ███████ as emotionally disturbed in the face of strong evidence of a speech and language impairment.  In a similar case, *SRO 01-057*, the Office of State Review held that the district did not meet its burden of showing that the CSE had properly reclassified the student as emotionally disturbed because they failed to show that

the problems in the student's educational performance were not the result of sensory or health factors. There, the CSE did not consider a central auditory processing ("CAP") test that was recommended by a speech/language evaluation. Similarly here, the CSE did not consider the recommendations made for an auditory processing disorder ("APD") test made in an April 2010 speech and language evaluation. (Ex. 25 at p. 11). In fact, this IEP does not incorporate the comprehensive recommendations from the speech and language evaluation that directly address ████████'s speech and language deficits which have persisted since he was first referred to the CSE. The failure to consider these recommendations clearly violates the mandate that the IEP take recent evaluations into consideration. (Id. at 11-13; § 200.4(d)(2)).

████████'s classification as "emotional disturbance" in this August 2010 IEP is contrary to the statutory definition of emotional disturbance as:

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance: (i) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (iii) inappropriate types of behavior or feelings under normal circumstances; (iv) a generally pervasive mood of unhappiness or depression; or (v) a tendency to develop physical symptoms or fears associated with personal or school problems. The term includes schizophrenia. The term does not apply to students who are socially maladjusted, unless it is determined that they have an emotional disturbance.

13

§ 200.4(d)(2). The District used no documents and indeed can show no documents to support the claim that an emotional disturbance ("ED") is the reason for ███'s lack of academic progress or that that this condition, which has never been cited before, has adversely affected ███ over a long period of time. In fact, ███'s entire educational record completely contradicts the claim of longstanding emotional disturbance given the many references to persistent deficits in learning, language and communication. Recent evaluations confirm these historical problems persist. For example, a May 2010 neuropsychological evaluation attributes ███'s deficits to "learning difficulties". (Ex. 28 at p. 6); March 2010 Speech and Language evaluation suggests ███ may have "auditory processing issues". (Ex. 25 at p. 11).

An additional problem with the ED classification is that the record directly contradicts the claim (ii) that ███ has been unable to build or maintain relationships with his peers and teachers. The November 2008 IEP describes ███ as "a pleasant young man who exhibits age-appropriate interactions with peers and adults. ███ benefits from . . . opportunities to work in small groups with peers." (Ex. 16 at p. 5). ███'s March 2008 IEP states, "███ is respectful of his peers as well as adults." (Ex. 15 at p. 3). Additionally, a March 2005 IEP states "███ is respectful toward authority figures." (Ex. 10 at p. 8).

███ does not meet the fourth possible characteristic to point towards an emotional disturbance disability. This characteristic is explained as "a generally pervasive mood of unhappiness or depression." § 200.4(d)(2). Numerous documents contain assessments quite the opposite of this. "███ is a pleasant, talkative young man . . . ." (Ex. 16 at p. 3). "He was friendly and warmed up well to the examiner." (Ex. 28 at p. 1). "███ is a polite, attentive, friendly, pleasant 12 years and 9 months old youngster." (Ex. 21 at p. 3). "When he tries, ███ is truly pleasant and good-natured." (Ex. 20 at p. 4). Various other documents

include similar assessments clearly pointing to the invalidity of this characteristic towards
███████.

Finally, the "emotional disturbance" classification is inappropriate because the District
can offer no evidence in support of the two remaining prongs of the disability's definition, (iii) or
(iv).  There is currently no evidence in the record and no support in the IEP that relates to
"inappropriate types of behavior or feelings under normal circumstances" or "a tendency to
develop physical symptoms or fears associated with personal or school problems", either which
have existed over a long period of time and affected the student's education performance
adversely. § 200.4(d)(2).

The August 2010 IEP was developed inappropriately, contains an inaccurate
classification, and therefore the recommended placement and annual goals are similarly
inappropriate and inaccurate.  The August 2010 IEP recommends ███████ be placed in a District
75 school setting. (Ex. 30 at p. 1).  This however is based on an incomplete assessment of the
available evaluations (supra pp. 12-14) and an inaccurate classification (supra p.12-14).
Furthermore, a District 75 setting is not the appropriate placement for ███████ (See infra p. 15).

**B.**      ***The District's procedural failures consistently resulted in substantive violations***
           ***of IDEA because the IEPs developed by the District were not reasonably***
           ***calculated to confer educational benefit.***

In order for the school district to comply with IDEA, the program offered to the student
must be reasonably calculated to deliver educational benefits and allow the child to achieve
passing marks and advance from grade to grade.  See Bd. of Educ. of the Hendrick Hudson Cent.
School Dist. v. Rowley, 458 U.S. 176, 204-05 (1982).  The Court in Rowley added that "the

grading and advancement system thus constitute an important factor in determining educational benefit." Id.

███████'s grades reflect a pattern of continual low performance and that between the 6th (Ex. 26 at p. 1) and 7th grade (Ex. 26 at p. 4) became gradually worse.  In the first marking period as a 6th grader, ███████'s average was a 66.7%; this decreased to a 61.67% at the end of the second marking period. (Ex. 26 at p. 1).  The following year as a 7th grader, ███████'s first marking period average was a 57.00% and the second marking period was also a 57.00%.  These grades indicate that ███████s special education program was not delivering an educational benefit and was not reasonably calculated to confer a benefit.

As a 6th grader, ███████ was reading at a 3rd grade level. (Ex. 16 at p. 3).  His November 2008 IEP, listed the following goal—to increase reading comprehension from a 3rd grade level to a late 4th grade level. (Id. at p. 7).  One year later, in the October 2009 IEP, ███████'s reading comprehension subtests were equivalent to a 2.6 grade level. (Ex. 22 at p. 3).  Not only did this show a lack of academic progress, but indicated a possible regression in reading comprehension. In that same October 2009 IEP, although in 7th grade, ███████'s letter word recognition was at the 2.6 grade level, and spelling was at the 3.1 grade level. (Ex. 22 at p. 4).  In math, which was generally seen as ███████'s stronger subject, he was operating at a 4.5 grade level in math concepts/applications and at a 6.0 grade level in math computation. (Id.).  The CSE must determine what needs have to be met to facilitate the child's involvement and progress in the general curriculum and what special education and other services and supports are required to meet those needs. *SRO No. 01-056*.  By looking at ███████s progress reports and evaluations, it is evident that his curriculum was not reasonably calculated to deliver educational benefit and as a result, he was unable to progress.

16

The examples above represent only a fraction of the numerous examples of evidence of ██████'s lack of academic progress.  The most egregious examples include:

- The November 2008 IEP contained annual goals that stated ██████ should be reading at high fourth grade level by the end of a one year mark. (Ex. 16).  One year later, ██████'s 2009 IEP indicated he was reading at a 2.6 grade level. (Ex. 22).

- The October 2009 IEP, indicates that "this program has not address (*sic*) student's language, academic and socio-emotional difficulties." (Ex. 22 at p. 11).

None of the above outlined facts are in dispute.  Year after year the IEPs that the District developed were clearly inadequate. Year after year ██████ failed to progress.  In view of the ominous record of ██████'s lack of progress, it is axiomatic that the IEPs developed from 2007-2009 were NOT reasonably calculated to confer an educational benefit.

**C.**    ***The evidence of the District's failure to provide a free, appropriate education is overwhelming.***

IDEA seeks to ensure that all children with disabilities have available to them a "free, appropriate public education." 20 U.S.C.A. § 1400(d)(1)(A).  Under this law, disabled students must be provided with a free, appropriate public education which consists of an IEP for each disabled student, and significant procedural safeguards established for disabled students and their parents or guardians that may be enforced through administrative hearings and civil actions in state or federal court. 20 U.S.C.A. §§ 1400 et seq.  The Act has been described as "the most important piece of civil rights legislation for children with disabilities ever passed in this country." Disability Rights Education & Defense Fund, http://www.dredf.org/idea/index.shtml

(last visited Nov. 2, 2010). The tenets of this major piece of legislation are not to be taken lightly.

The aforementioned procedural and substantive failures on the part of the District amount to an absolute denial of a free, appropriate public education to ███. In Rowley, 458 U.S. at 206-207 the United State Supreme Court explained that "a court's inquiry in suits brought under [IDEA] § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Using this analysis we can see that the District failed on both prongs of the inquiry. As already established, at every stage of ████'s education history, from referral to evaluation and placement, the District violated IDEA procedures. They failed to conduct proper evaluations, supra pp. 6-8, they failed to properly classify ████, supra pp. 8-9, failed to provide proper notice to the parent about IEP meetings, supra pp. 10-11, failed to include necessary individuals as part of an IEP team, supra p. 10, and failed to consider the concerns of the parent as input to the IEP development, supra p. 11. Second, it has also been established that the many IEPs developed by the district did not enable ████ to receive educational benefits. Supra pp. 15-17. This point can hardly be argued due to the overwhelming amount of evidence pointing to ████'s lack of academic progress. Supra pp. 15-17. It is undeniable in this instance that the District's actions satisfy both tenets of the Court's analysis and that these actions constitute a failure to provide ████ with a free, appropriate public education.

III.   **THE DISTRICT FAILED TO MEET ITS BURDEN OF PRODUCTION AND PERSUASION.**

Under IDEA, the burden of persuasion in an administrative hearing is placed upon the party seeking relief. See Schaffer v. Weast, 546 U.S. 49, 59-62 (2005). However, in August

2007 New York State amended the Education Law to place the burden of production and persuasion upon the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement would continue to have the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c], as amended by Ch. 583 of the Laws of 2007). By failing to respond to her complaint, let alone adequately meet the burden of production and persuasion, the District violated ███████'s right to a FAPE. The Parent's claims should be accepted on their face as valid due to the District's lack of response, failure to produce documents, produce witnesses, or even make a statement on the record contradicting the claims.

The District did not even attempt to meet its burden in this case. State and federal law require the school district, within 10 days of receiving the due process complaint notice, to send a response to the complaining party that specifically addresses the issues raised in the notice. § 200.5(I) (4)(5); 20 U.S.C.A. § 1415. The school district did not submit any response to the Parent's complaint.

Similarly, as stated earlier, the District did not offer any evidence or call any witnesses at the hearing. Given these failures, there is no way the District can be said to have met its burden under the law.

## IV.   DUE TO THIS DENIAL OF FAPE, ███████ IS ENTITLED TO THE FOLLOWING RELIEF:

The District's denial of FAPE, both past and present, demands comprehensive relief in the form of (a) compensatory, remedial and make-up services, (b) a reconvening of the CSE to amend ███████'s IEP, and (c) a private school placement. These remedies are necessary for ███████ to receive the appropriate education to which he is entitled. ███████ has been denied the

opportunity to progress and the aforementioned remedies are essential to ultimately obtain the

FAPE he has been so blatantly denied.

**A.**   ***Compensatory, remedial and make-up services are necessary to account for the***

***many years*** █████ ***was denied a FAPE.***

**1.**   █████ **is entitled to a <u>minimum</u> of 198 hours of make-up services in**

**the form of intensive speech and language therapy.**

█████ must be granted an RSA to make-up for the many years of missed or inadequate

speech and language services.  "The school district must provide special education and related

services to a student with a disability in accordance with the student's IEP . . . ." § 200.4(e)(7).

The District failed to comply with this regulation in implementing █████'s IEP.  <u>See</u> <u>supra</u>

pp.11-12.  A failure to provide these related services often results in an award of "additional

services".  <u>See</u> <u>Application of a Student with a Disability</u>, Appeal No. 10-057 at p. 7 (citing <u>Bd.</u>

<u>of Educ. v. Munoz</u>, 16 A.D.3d 1142 (4th Dep't 2005) (finding it proper for a State Review

Officer to order a school district to provide "make-up services" to a student upon the school

district's failure to provide those educational services to the student during home instruction);

<u>Application of the Bd. of Educ.</u>, Appeal No. 09-054 (awarding additional instructional services

to remedy a deprivation of instruction); <u>Application of a Student with a Disability</u>, Appeal No.

09-044 (awarding "make-up" counseling services to remedy the deprivation of such services)).

To make up for missed services, detailed below, █████ must be granted an RSA to secure an

independent provider to provide additional services paid for by the Department of Education.

Over the past three years, █████ missed an incalculable amount of speech and language

therapy due to the District's failure to properly implement his IEPs.  Starting as early as 2004,

█████'s IEPs have included speech and language therapy sessions. (Ex. 7).  In March 2007

███████'s IEP included speech and language therapy, three times a week, for 30 minutes, on an individual basis. (Ex. 14 at p. 15).  In March 2008 twice a week, for 40 minutes, in a group of no more than three students (Ex. 15 at p. 13); and finally in November 2008 and October 2009 his IEP mandated speech and language therapy once a week, for 40 minutes, on an individual basis, as well as twice a week, for 40 minutes, in a group of no more than five students. (Ex. 16 at p.12; Ex. 22 at p. 12).  The District did not provide any proof of the number of hours of these services ███████ has *actually* received.  It is unclear if these sessions ever happened at all as ███████'s progress in these areas is minimal to none.  Therefore, *at a minimum,* the District is obligated to provide 198 hours of speech and language therapy.  This represents the 2007/2008 school year where the District was supposed to provide 40 minutes of therapy twice a week and the 2008/2009 and 2009/2010 school years where the District was supposed to provide 40 minutes of therapy three times a week and failed to do so.

In a March 2010 Speech and Language Evaluation, Nancy Geller, a Speech Language Pathologist with over 20 years of experience[3], recommended that ███████ receive "[i]ntensive, individual listening, speech and language therapy with a focus on improving ███████'s auditory processing skills." (Ex. 25 at 11).  This report also included detailed information on which areas should be targeted.  An RSA is necessary to compel the District to pay for an independent provider of plaintiff's choosing.  This provider can supply ███████ with the appropriate amount of speech and language therapy necessary to make-up for the many hours the District failed to supply.

---

[3] Center for Hearing and Communication – Who We Are, http://www.chchearing.org/about-us/who-we-are (last visited Oct. 27, 2010)

2.        ████ is entitled to 360 hours of one-on-one private tutoring as a
remedial service to assist him in developing the basic reading and
writing skills.

████ should also be granted an RSA for one-on-one private tutoring in the area of
reading and writing. "State Review Officers have awarded 'additional services' to students who
remain eligible to attend school and have been denied appropriate services, if such deprivation of
instruction could be remedied through the provision of additional services before the student
becomes ineligible for instruction by reason of age or graduation." Application of a Student with
a Disability, Appeal No. 09-035 (awarding 1:1 reading instruction as compensation for a
deprivation of a FAPE); see Application of a Student with a Disability, Appeal No. 08-072
(awarding after school and summer reading instruction as compensatory services to remedy a
denial of a FAPE); Application of a Student with a Disability, Appeal No. 08-035 (awarding ten
months of home instruction services as compensatory services). ████ has been denied a
FAPE. See supra pp. 17-18. Additional services in the areas of reading and writing are
necessary to remedy this denial.

████'s performance in the areas of reading and writing is exceedingly low. This is
discussed in his August 2010 IEP:

████ is a 13 year old student [8th grade level]. His academic
achievement indicated that his ability to read and write was significantly low . . . .
On a task, that measures the subject's ability in spelling orally presented letters
and words, ████'s score was at the middle of the 3rd grade level. On a task of
writing meaningful sentences according to verbal instructions, ████'s score fell
at the end of the 2nd grade level. On a subtest that measures the subject's ability

to listen and immediately recalls detail[s] of the story, his score fell at the beginning of the 1st grade level.

(Ex. 30 at p. 3).  In a June 2010 teacher's report, ███████'s special education teacher described his English and Language Arts skills as "far below grade". (Ex. 27 at p. 11).  In ███████'s October 2009 IEP as a 7th grade student, ███████'s reading level was categorized at a 2.6 grade level. (Ex. 22 at p. 3).

As a remedy for the years ███████ was denied a FAPE which undoubtedly contributed to these significantly low reading levels, ███████ must be granted an RSA for private one-on-one tutoring in the areas of reading and writing.  In calculating the requisite number of hours to make up for the deficits in his program, LSLS assumes, that at a minimum, his program should have included an hour of reading and writing instruction on each of the mandatory 180 school days each year since November 2007 (two years prior to filing the complaint).  To compensate for the lack of adequate reading and writing instruction over the two year period we seek 360 hours of intensive one-on-one reading and writing instruction provided over a two year period at the rate of $110 per hour.

**B.      The CSE must be reconvened to amend the August 2010 IEP.**

Reconvening the CSE is required in order to amend ███████'s procedurally and substantively deficient August 2010 IEP.  "Amendments to an IEP made after the annual review may be made by rewriting the IEP or by developing a written document to amend or modify the student's current IEP . . . ." § 200.4(g)(1).  As previously discussed, the August 2010 IEP is insufficient and unsatisfactory.  See supra pp. 12-15.  Amendments are necessary to remedy the improper classification and annual goals, among other things.  In addition, to add the speech and language therapy as well as the reading and writing services outlined above, the amended IEP

23

should also take into account the recommendations of various independent evaluations conducted on ▮▮▮▮ (See Ex. 25; Ex. 28).

Specifically, classroom recommendations from the March 2010 Speech and Language Evaluation should be considered and included when amending ▮▮▮▮s IEP. The governing statute specifically provides that when developing a student's IEP, the results of recent evaluations are to be taken into consideration. § 200.4(f)(1)(iii). The Speech and Language evaluation recommended such classroom changes including but not limited to: (a) the presence of a Special Education Itinerant Teacher to preview and review material, monitor reception, etc.; (b) environmental changes like closing doors, using a cork or felt board, and an area rug all to reduce external noises; (c) instruction modification; and (d) a note-taker. (Ex. 25 at pp. 12-13). It is not clear if these recommendations were taken into consideration when developing the current IEP but certainly they should be accounted for when the CSE is reconvened and this insufficient IEP is amended.

Finally, the amended IEP should include a deferral to the CBST to place ▮▮▮▮ in a nonpublic school, with transportation if needed. The CBST provides assistance in identifying an appropriate educational setting. As is explained below the appropriate educational setting for ▮▮▮▮ is a nonpublic school and the deferral to the CBST should include a mandate that a nonpublic school setting be included in their recommendation.

**C.**   ***The appropriate educational setting for*** ▮▮▮▮ ***and the appropriate remedy to the denial of FAPE in this instance would be a nonpublic school setting.***

The appropriate remedy for ▮▮▮▮ would be placement in a private school setting. The United States Supreme Court has held that if a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private

school and seek reimbursement for the cost of that school from the state. Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 367 (1985). In determining whether parents are entitled to reimbursement, the Supreme Court has established a two pronged test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs. See id. at 370; see also Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12-13 (1993). ████'s case satisfies this legal standard. As previously established, (1) multiple IEPs with inaccurate and uninformed classifications, including the most recent August 2010 IEP have been inappropriate, demonstrated by ████'s continual lack of progress. See supra p. 15-17. As will be shown below, (2) the proposed private school placement is appropriate to meet ████'s individual needs. See infra pp. 26-27.

It should be noted that while we are seeking placement and not reimbursement for a private school, the above cases are still applicable and valid governing law. As Judge Koeltl explained in S.W. v. New York City Dept. of Educ., 646 F.Supp.2d 346, 360 (S.D.N.Y. 2009), parents without the financial resources to pay for private school in advance should not be denied that same private school tuition as a remedy or relief. Courts often order school districts to make prospective tuition payments directly to a private school. See, e.g., Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1284-86 (11th Cir. 2008) (prospectively awarding plaintiff with placement in private school); Sabatini v. Corning-Painted Post Area Sch. Dist., 78 F.Supp.2d 138 (W.D.N.Y. 1999) (granting preliminary injunction requiring district to pay for private placement and instructing district to "make whatever financial arrangements are necessary" to allow student to attend private school); see also Connors v. Mills, 34 F.Supp.2d 795 (N.D.N.Y. 1998) (noting in dicta that a district court could order prospective payment directly to a private school if the parent showed that he or she was unable to front the cost of the private school). Our case fits in

this same category. ████s IEP was inappropriate, placement in a nonpublic school is appropriate, and should be prospectively paid for by the District.

████ has been denied a free, appropriate public education for far too long. "We have recognized that the [IDEA] Act 'reflects a structural preference in favor of providing special education in public schools,' but we have explained that when a public school fails to provide an adequate education in a timely manner a placement in a private school may be appropriate." Draper, 518 F.3d at 1285 (quoting Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1312 (11th Cir. 2003)) (granting an award of compensatory education in the form of placement at private school). ████ has been in the public school system for over six years. He has been evaluated, classified, and reclassified a number of times over those years but the District has continuously failed to develop and/or implement an adequate IEP.  It is crucial that at this stage in ████'s development he is granted the remedy necessary to ensure he receives the services he needs to grow into an independent and productive adult.

Granting ████ make-up services in the form of speech and language therapy and private tutoring is not enough to make him whole.  ████ needs an environment where he is guaranteed individualized attention to his progress or lack thereof.  The District has failed in this effort for far too long and there is no time for second chances.  ████ should be placed in a setting proven to be successful in these endeavors.  The ideal environment would be a school that incorporates all of the individual services that ████ needs into his daily curriculum.  A private school setting, not the addition of more services, is the proper 'make-up' in this instance for the excessive denial to ████ of a free, appropriate public education.

Since █████'s unique needs have clearly not been addressed in the public school system despite his many years as a special education student, he must be placed in a private school setting where services tailored to his individual needs are readily available.

One such private school setting with the services readily available to meet █████'s specific needs is the School for Language and Communication Development (SLCD) in Queens, New York.[4]  SLCD is a small school with approximately 90 students and it appears that █████ would be an appropriate fit here.  Numerous teacher evaluations have described the need for instructions to be repeated over and over to █████.  SLCD uses a language technique in which teachers monitor responses by re-directing, paraphrasing, simplifying, and re-phrasing instructional input.  This matches █████'s learning style.  Additionally, a majority of the students at SLCD have classifications of (a) speech and language impaired, (b) hearing impaired, (c) learning disabled, or (d) emotionally disturbed.  █████ has previously been placed in at least two of these classifications and many of the students at SLCD have been diagnosed with ADHD and/or an auditory processing disorder which matches █████'s prior diagnoses.  Students at SLCD must have an IQ of at least 70 which █████ does.  The Parent has already begun to explore placement at SLCD and has determined that █████ will fit in well with the other students there and likely could benefit from some positive academic peer role models.

In addition to fitting in well, the setting is appropriate and will likely produce academic progress for █████.  The Second Circuit has held that for purposes of an action for reimbursement for the cost of private school placement under IDEA, an "appropriate" private placement is one that is likely to produce progress, not regression.  Gagliardo v. Arlington Cent. School Dist., 489 F.3d 105 (2d Cir. 2007).  What is considered an "appropriate" educational setting received a broad and flexible interpretation in Florence County, 510 U.S. 7 and Frank G.

---

[4] http://www.slcd.org/

27

and Diane G. Bd. of Educ. of Hyde Park Cent. School Dist., 459 F. 3d 356 (2d Cir. 2006).  SLCD

entails a twelve month program which would give ████ a chance to learn the curriculum at a

slower pace.  The ratio of students to teachers in his classroom would be 12:1:3.  In the

classroom he would be provided with intensive group speech therapy, a reading and writing

program tailored to his level, and counseling two days a week.  These services have been noted

as necessities for ████ and incorporating them into his daily academic curriculum we believe

would finally give ████ the opportunity to progress.  Prospective payment and an order for

CBST to place ████ in a school like SLCD is the appropriate remedy to this egregious denial

of FAPE.

## V.    CONCLUSION

Over the past six years, ████ has had ten different IEPs and a total of four

different classifications.  During that time, he has progressed minimally in some areas and has

regressed in others.  Supra pp. 15-17.  Despite this general lack of progress and various

classifications, multidisciplinary, comprehensive evaluations targeting ████'s suspected

disabilities never occurred until the District and LSLS, on behalf of the Parent, entered into a

Partial Agreement.  Though this Agreement addressed the issue of comprehensive evaluations at

public expense, it failed to respond to the Parent's complaint dating from November 2009.  In

fact, one of the reasons the Agreement was deemed "Partial" was because LSLS refused to

abandon its claim regarding the District's failure to provide ████ with a free, appropriate

public education.  In asserting those claims, LSLS, on behalf of the Parent, alleged that the

District had failed to (1) properly identify ████'s disability; (2) properly classify ████ in

2007, 2008 and 2009; (3) provide ████ with an adequate evaluation in developing his IEP in

2007, 2008 and 2009; (4) develop an adequate IEP for █████; and (5) properly implement

█████'s 2008 and 2009 IEP.

     Due to these failures, LSLS respectfully requests that IHO Ralph Pennington award the

following relief in its entirety: (a) services, (b) reconvening of the CSE to amend █████'s IEP,

and (c) placement in a nonpublic school setting. At thirteen years old, it is still possible for

█████ to overcome setbacks caused by the District's failures. With a structured environment in

a nonpublic school that focuses on speech and language development and counseling, █████

will receive an appropriate education that allows him to progress academically.


                            RESPECTFULLY SUBMITTED:
                            November 5, 2010

                            *Leah Hill*/SM
                            Leah Hill, Esq.-Supervising Attorney
                            Siobhain Minarovich, Legal Intern
                            Bernard Dufresne, Legal Intern
                            Katherine Acosta, Social Work Intern
                            Lincoln Square Legal Services, Inc.
                            33 West 60th Street, 3rd Floor
                            New York, NY 10023
                            (212) 636-6934
                            lhill@law.fordham.edu

# EXHIBIT S

# FINDINGS OF FACT AND DECISION

Case Number:           125343

Student's Name:        ███████

Date of Birth:         November 26, 1996

District:              3

Hearing Requested By:  Parent

Date of Hearing:       June 9, 2010
                       September 21, 2010

Hearing Officer:       Ralph Pennington, Jr., Esq.

Hearing Officer's Findings of Fact and Decision                                            1

Case No.  125343

_____

<u>NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 9, 2010</u>

<u>PARENT</u>
LEAH HILL, Attorney
ALEXANDRA ALVAREZ, Legal Intern
RACHEL WU, Legal Intern
KASI LEGRAND, Social Worker
AARON SCHEINWALD, Legal Intern

<u>DEPARTMENT OF EDUCATION</u>
WILLIAM R. WOODS, CSE Representative

<u>NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 21, 2010</u>

<u>PARENT</u>
LEAH HILL, Attorney
███████████, Parent
BERNARD DUFRESNE, Legal Intern
SIOBHAIN MINAROVICH, Legal Intern
KATHERINE ACOSTA, Social Worker Intern
AARON SCHEINWALD, Legal Intern
TANYA COVINGTON, Social Worker

<u>DEPARTMENT OF EDUCATION</u>
NICHOLAS CHAVARRIA, CSE Representative

Hearing Officer's Findings of Fact and Decision                                    2

Case No. 125343

---

## PARENT'S POSITION

The parent contends that the New York City Department of Education (hereinafter referred to as "Department"), has failed to identify and properly classify this student for the 2007, 2008 & 2009 school years. The department failed to neither provide the student with an adequate Individualized Education Program (IEP) nor properly implement an IEP for the 2008 and 2009 school years.

With respect to relief, the parent seeks: an related services authorization ("RSA") to receive a minimum of one hundred and ninety-eight hours of compensatory education in the form of speech therapy to compensate for missed services; an RSA to receive three hundred and sixty hours of compensatory education in the form of reading and writing instruction; Committee on Special Education (CSE) to reconvene to draft an appropriate IEP with a deferral to Central Based Support Team (CBST) so that the student may be placed in a nonpublic school setting with transportation provided; and the parent seeks placement at the School for Language and Communication Development.

## DEPARTMENT'S POSITION

The Department is silent as to any argument in opposition, except that if the requested placement is not available then that a comparable placement be made immediately. Secondly, the department argues that the RSA's are provided for specific related services with a specific provider and not for a non-specified provider.

## Evidence presented:

## On Behalf of the Department;

The department presented no documentary or testimonial evidence.

## On Behalf of the Parent;

██████████, Parent, testified that she is the parent of the student (Tr.26). She first noticed that the student had issues around ages six or seven (Tr.27). The student was not listening and attending (Tr.27). He had difficulty with his homework (Tr.28). He had difficulty with his homework every day (Tr.29). It would take him five or six hours to do his homework (Tr.29). The student has made no progress in the past five-six years (Tr.32). Said witness requested to the department that the student be reevaluated and

Hearing Officer's Findings of Fact and Decision                                3

Case No. 125343

never received a response (Tr.32). She feels that the student requires a small class (Tr.32). She has no difference from last school year to this school year (Tr.33). She would like to be more involved in the IEP process and more in contact with his teachers (Tr.33).

Moreover, the student has difficulties at home (Tr.34). Often, she has to repeat herself when requesting him to do something (Tr.35). The student is currently failing his academic classes (Tr.35).

No cross examination was conducted of this witness.

FINDINGS FACTS AND CONCLUSIONS OF LAW:

I find that the evidence clearly establishes that the student is a fourteen (14) year old student who is classified as speech and language impaired on the October 2, 2009 IEP. The most recent IEP of August 2010 classifies the student with an emotional disturbance. The student presents with poor comprehension, spelling, reading and math skills. Exhibit twenty-two shows that academically, the student performs in a range from 2.6 to 6.0 grade equivalent in various academic domains. The student is impulsive and has difficulty controlling his emotions. He has been diagnosed with attention deficit hyperactive disorder and oppositional defiant disorder.

Compensatory education, i.e., special education services provided to a student is a permissible remedy under the Individuals with Disabilities Education Act (IDEA) when the student has been excluded from school or denied appropriate educational services for an extended period of time (Mrs. C. v. Wheaton., 916 F.2d 69 [2d Cir. 1990]; Burr by Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]; Lester H. v. Gilhool, 916 F.2d 865 [3d Cir. 1990]; Miener v. State of Missouri, 800 F.2d 749 [8th Cir. 1986]). Compensatory education is an equitable remedy that is tailored to meet the circumstances of the case (Wenger v. Canastota, 979 F. Supp. 147 [N.D.N.Y. 1997]). It may be awarded if there has been a gross violation of the IDEA resulting in the denial of, or exclusion from, educational services for a substantial period of time (Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]; Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]; Application of the Bd. of Educ., Appeal No. 02-047).

Hearing Officer's Findings of Fact and Decision                                    4

Case No. 125343

While, compensatory education is a remedy that is available to students who are no longer eligible for instruction, I note that State Review Officers have awarded additional services to students who remain eligible to attend school and have been denied appropriate services, if such deprivation of instruction could be remedied through the provision of additional services before the student becomes ineligible for instruction by reason of age or graduation (Application of a Child with a Disability, Appeal No. 05-096; Application of a Child with a Disability, Appeal No. 04-054; Application of the Bd. of Educ., Appeal No. 02-047; Application of a Child with a Disability, Appeal No. 02-042; Application of a Child with a Disability, Appeal No. 02-030).

Based upon my review of the record, I find that a gross violation of FAPE was committed by the department for the 2008-2009 and 2009-2010 school years. Therefore, I agree with the parent's attorney that the student is entitled to and has the opportunity to receive the additional services requested. The parent's credible testimony along with exhibits nine, ten, twelve, fourteen and twenty-two, establish the student's delays and lack of progress. Further, the record establishes that the student's classification has been changed numerous times. The department presents no evidence and no witnesses in this matter.

Further, the record substantiates that the student has not been properly evaluated. Exhibits twelve, fourteen and fifteen improperly classify with the non-existent classification of "mentally deficient". A category that does not exist under the IDEA or any applicable New York State Law provisions. The fact that such improper classification was repeated in more than one IEP is proof that the department failed to properly develop an appropriate IEP over a substantial period of time.

Moreover, a review of exhibit fourteen reveals that the IEP team of March 17, 2007 was not properly composed. Said IEP team did not have a special education teacher, a district representative, a parent or a parent member. Said IEP team clearly was missing mandatory members of the team. This evidence further corroborates the parent's argument that the department has not only failed to provide FAPE to this student but failed to develop an appropriate IEP and properly classify this student over a number of years. Furthermore, the parent did not attend the CSE meeting that resulted in exhibits

Hearing Officer's Findings of Fact and Decision                                      5

Case No.  125343

─────────────────────────────────────────────────────────────────

fourteen and fifteen; therefore said IEP's were developed without meaningful participation of a key CSE member, the parent.

Clearly, as a result of the above-noted discussion, the student has been deprived of instruction over a substantial period of time which the department does no refute. Although it is alleged by the parent that the student was not provided with numerous speech therapy sessions, the department fails to present any evidence to rebut and or counter said argument. On the basis of exhibits sixteen and twenty-two, it appears that the student has missed at least one hundred and ninety-eight hours of speech therapy.

Furthermore, to remedy the denial of FAPE and the lack of instruction and services, under these circumstances, the parent seeks additional services of private tutoring.  The record reveals that the student has poor reading and writing skills (Exhibit 30). The parent requests three hundred and sixty hours of private tutoring at the rate of one hundred ten dollars per hour. However, the parent does not submit any evidence to justify the requested enhanced rate, inclusive of a particular provider, for said private tutoring. Therefore, the private tutoring will be provided at the department rate.

Thus, I direct the department to provide the student with the additional services, noted above to allow him to make up for instruction and services that he missed.  Thus, the student is to be provided with up to one hundred and ninety-eight hours of speech and language therapy and three hundred and sixty hours of private tutoring, to commence from the date of this decision until June 30, 2012.  The private tutoring is to be provided at the department rate.  If necessary, the department is to provide the parent with a Related Services Authorization (RSA) so that she may acquire the necessary additional services noted above.

Lastly, pursuant to the parent's request, a duly constituted CSE team is to reconvene, within two-three weeks, and said CSE team is to consider all evaluations and also consider a deferral to CBST for placement/program and/or the School for Language and Development as a proposed placement.  The parent further requests that the student be placed at the School for Language and Communication Development.  However, the record is devoid of any evidence to substantiate the appropriateness of said placement.

Hearing Officer's Findings of Fact and Decision                                    6

Case No. 125343

_____

The parent did not testify as to the proposed school nor was any other witness presented to testify to such. There is no documentary evidence to substantiate the appropriateness of the proposed placement. Therefore, the CSE team is to consider said potential placement. It is hereby:

        So Ordered,

The department is to provide the student, as compensatory education, with up to one hundred and ninety-eight hours of speech and language therapy and three hundred and sixty hours of private tutoring, to commence from the date of this decision until June 30, 2012. The private tutoring is to be provided at the department rate. Also, a duly constituted CSE team is to reconvene, within two-three weeks, to develop an appropriate IEP. Said CSE team is to consider all evaluations and also consider a deferral to CBST for placement/program and/or the School for Language and Development as a proposed placement. If necessary, the department is to provide the parent with an RSA so that she may acquire the necessary additional services noted above.

Dated: December 30, 2010

RALPH PENNINGTON, JR., ESQ.
Impartial Hearing Officer

RPJ:jj

Hearing Officer's Findings of Fact and Decision                                    7

Case No. 125343

---

PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                    8

Case No. 125343

--------------------------------------------------------------------------------

### DOCUMENTATION ENTERED INTO RECORD

#### PARENT

| | |
|---|---|
| 1 | Connor's Teacher's Rating Scale, 2003, 4 pp. |
| 2 | Social History, 2003, 3 pp. |
| 3 | Psycho-Educational Evaluation, 1/12/2004 and 2/04/2004, 3 pp. |
| 4 | Psycho-Educational Evaluation, 1/12/2004 and 2/04/2004, 2 pp. |
| 5 | Speech and Language Evaluation 2004, 4 pp. |
| 6 | Structured Classroom Observation Record, 004, 3 pp. |
| 7 | IEP, 2/25/2004, 13 pp. |
| 8 | IEP, 1/11/2005, 10 pp. |
| 9 | Speech and Language Progress Report, 3/01/2005, 1 p. |
| 10 | IEP, 3/10/2005, 18 pp. |
| 11 | Interim Service Plan, 2005, 2 pp. |
| 12 | IEP, 3/17/2006, 14 pp. |
| 13 | IEP, 3/17/2006, 14 pp. |
| 14 | IEP, 3/17/2007, 15 pp. |
| 15 | IEP, 3/20/2008, 13 pp. |
| 16 | IEP, 11/13/2008, 13 pp. |
| 17 | Social History, 2009, 4 pp. |
| 18 | Parent's Letter to Department, Undated, 1 p. |
| 19 | Teacher's Progress Report, 2009, 4 pp. |
| 20 | Functional Behavioral Assessment 2009, 7 pp. |
| 21 | Psycho-Educational Evaluation, 9/25/2009, 17 pp. |
| 22 | IEP, 10/02/2009, 12 pp. |
| 23 | Audiological Evaluation Results 3/30/2010, 1 p. |
| 24 | Speech Evaluation Summary 2010, 5 pp. |
| 25 | Speech Evaluation Full Report 2010, 13 pp. |
| 26 | Progress Reports, 2010, 4 pp. |
| 27 | Psychiatric Report, 5/27/2010, 27 pp. |
| 28 | Neuropsychological Evaluation Report, 4/26/2010, 10 pp. |
| 29 | Results of ENT, 08/18/2010, 1 p. |

#### POST HEARING

| | |
|---|---|
| 30 | IEP, 8/10/10, 14 pp. |

Version: 02/05/2009

| STUDENT NAME | IHO CASE NUMBER | PARENT/GUARDIAN NAME | | |
|---|---|---|---|---|
| ▬▬▬▬ | 125343 | ▬▬▬▬ | | |
| ORDER(S) | REQUESTED | COMPLETED | FINAL | AMENDED |
| SERVICE | YES | NO | Locked by Ralph Pennington, Jr. on 12/29/2010 2:35:23 PM | and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:22 PM |
| REIMBURSEMENT | NO | N/A | | |
| PAYMENT | YES | | Locked by Ralph Pennington, Jr. on 12/29/2010 2:35:23 PM | and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:23 PM |

# PAY ORDER

| STUDENT NAME | IHO CASE NO. | PARENT/GUARDIAN NAME |
|---|---|---|
| ▮▮▮▮▮ | 125343 | ▮▮▮▮▮ |

## The New York City Department of Education (DOE) is directed to PAY

## IT IS FURTHER DIRECTED THAT

Dept. to fund and/or provide the parent with an RSA for the additional services of 198 hours of speech therapy and 360 hours of private tutoring. Private tutoring to be at Board rate. Properly constituted CSE team to reconvene within 2-3 weeks and to consider all evaluations, consider deferal to CBST and proposed placement of SLCD, and devise an appropriate IEP.

**Dated:** 1/4/11                          **So Ordered:**

_Ralph Pennington, Jr., Esq._

Finalized and Locked by Ralph
Pennington, Jr. on 12/29/2010
2:35:23 PM

**Ralph Pennington, Jr.**
Impartial Hearing Officer Name

Impartial Hearing Officer Signature

4th Time Finalized and Locked by
Ralph Pennington, Jr. on 12/29/2010
2:42:23 PM

### PROOF OF SERVICE PROVISION

**A** Contract between school/provider & record of service
   a1 - Contract between parent and school/provider
   a2 - Record of attendance/service
**B** Invoice for tuition/service on school/provider letterhead and record of attendance/service (if applicable)
   b1 - Invoice for tuition/service on school/provider letterhead
   **b2** - Record of attendance/service
**C** School affidavit certifying cost and enrollment/service period
**D** Copy of independent evaluation report with date of service
**E** Daily transportation log identifying destination
**X** Other service document
**NO** DOE will reimburse parent upon submission of documents supporting the **provision of service**.

| STUDENT NAME | IHO CASE NO | PARENT/GUARDIAN NAME |
|---|---|---|
| | 125343 | ████████████ |

SERVICE

PAYMENT

4th Time Finalized and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:23 PM
2nd Time Finalized and Locked by Ralph Pennington, Jr. on 6/21/2010 3:17.41 PM
4th Time Finalized and Locked by Ralph Pennington, Jr. on 12/29/2010 2.42.23 PM

Dated: _____

Ralph Pennington, Jr.

Impartial Hearing Officer Name

So Ordered: _____

Ralph Pennington, Jr., Esq.

Impartial Hearing Officer Signature

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

# EXHIBIT T

LINCOLN SQUARE LEGAL SERVICES, INC.
Fordham University School of Law
33 West 60th Street, Third Floor
New York, NY 10023
(212) 636-6934

# AGREEMENT BETWEEN YOU AND LINCOLN SQUARE LEGAL SERVICES, INC.

This is an agreement between you, ████████ and Lincoln Square Legal Services, Inc. ("LSLS").  Pursuant to the Retainer Agreement entered into between you and LSLS on November 9th, 2009 ("Retainer Agreement"), you agree that LSLS will represent you in an application for attorney's fees pursuant to the Individuals with Disabilities Education Act (20 U.S.C. Section 1415(i)(3)(B)(i)).

Further, you agree, as per Paragraph 8 of the Retainer Agreement, that if any attorney's fees are awarded to you, the entire amount will be retained by LSLS to pay its expenses.

Dated: April 11, 2011

████████, Client

Bernard Dufresne, Legal Intern

Morgan Petriello, Legal Intern

Leah Hill, Supervising Attorney

# EXHIBIT U

# LINCOLN SQUARE LEGAL SERVICES, INC.

**Executive Director**
Ian Weinstein

**Supervising Attorneys**
Cheryl G. Bader
James A. Cohen
Elizabeth B. Cooper
Romaine L. Gardner
Brian Glick
Leah A. Hill
Gowri Krishna
Ron Lazebnik

**Supervising Attorneys**
Elizabeth A. Maresca
Michael W. Martin
Paul Radvany
Martha Rayner
Beth G. Schwartz
Marcella Silverman
Gemma Solimene

**Supervising Social Worker**
Kathy Ho, M.S.W.

Susan Fingerle, Esq.
Managing Attorney for Settlements and Claims
Office of the General Counsel
New York City Department of Education
335 Adams Street, 28th Floor
Brooklyn, NY 11201

March 25, 2011

Dear Ms. Fingerle:

Please find our request for attorney's fees and costs under the Individuals with Disabilities Educatioon Act (20 U.S.C. Section 1415(i)(3)(B)(i)).  As the attorneys for the prevailing party, we seek compensation for our services.

Lincoln Square Legal Services, Inc. represented Parent, ███████████, in Impartial Hearing No. 125343.  The impartial hearing took place over several months, with opening statement by Lincoln Square Legal Services, Inc. delivered on June 9, 2010, testimony by the Parent on September 21, 2010 and closing statement due November 5, 2010.  The impartial hearing resulted in a favorable decision for our client, and she was awarded the following: (a) Up to 198 hours of compensatory speech and language therapy, (b) 360 hours of private tutoring and (c) a CSE meeting to develop an appropriate IEP, consider all evaluations and consider a deferral to CBST for placement in an appropropriate educational setting.

I have enclosed our attorney's fees claim with timesheets (Exhibit A), an attorney's affirmation (Exhibit B), five resumes for the law student interns who have worked on the matter (Exhibit C), parental authorization and assignment form (Exhibit D), the client retainer agreement (Exhibit E) and the impartial hearing decision (Exhibit F).

Please do not hesitate to contact our office if you need additional material from us.  We look forward to hearing from you.

Sincerely,

Leah A. Hill, Supervising Attorney

CC: Bola Ogunleye, Esq.

**Fordham University School of Law~33 West 60th Street, Third Floor~New York, NY 10023**
**Phone: (212) 636-6934   Fax: (212) 636-6923**

# Exhibit A

Child's Name: 
IHO Case Number: 125343
Parent's Name: ████████
School District: 3

## Attorney's Fee Claim

Attached herein are time sheets for the legal interns and supervising attorney assigned to the matter since its inception. As attorneys for the prevailing party, we seek compensation for the work performed by the legal interns and supervising attorney at the market rate for law students in New York City of $150 an hour and at the market rate for attorneys of $400 an hour  The timesheets for the five legal interns reflect a combined total of 320.43 hours expended from the filing of the complaint through the impartial hearing to the completion of the closing statement as well as 20.67 hours expended on this fee request. The supervising attorney, Leah Hill, billed 14.58 hours during the same time period.

We seek the following fees and expenses:

### SUMMARY OF ATTORNEY'S FEES REQUESTED (Lincoln Square Legal Services, Inc.)

#### Impartial Hearing Hours

| Legal Intern | Hours | Rate/Hour | Lodestar Calculation |
|---|---|---|---|
| Alexandra Alvarez | 72.28 | $150/hour | $10,842.00 |
| Stacy M. Sadove | 43.00 | $150/hour | $6,450.00 |
| Rachel Wu | 30.48 | $150/hour | $4,572.00 |
| Siobhain Minarovich | 83.17 | $150/hour | $12,475.50 |
| Bernard Dufresne | 70.83 | $150/hour | $10,624.50 |

| Supervising Attorney | Hours | Rate/Hour | Lodestar Calculation |
|---|---|---|---|
| Leah Hill | 14.58 | $400/hour | $5,832.00 |

#### Attorney's Fees Request Preparation

| Legal Intern | Hours | Rate/Hour | Lodestar Calculation |
|---|---|---|---|
| Bernard Dufresne | 20.67 | $150/hour | $3,100.50 |

**Total: $53,896.50**

Lincoln Square Legal Services, Inc.                                                    In Re ███████ IHO Case No. 125343

## Clinic Time Report

| Leah Hill | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | | | |
| | 11/12/2009 | 1 | Meeting-Supervision with ███ team to discuss case strategy |
| | 12/8/2009 | 1 | Meeting-In Office: Resolution meeting |
| | 2/24/2010 | 0.17 | Meeting-In Office: Meeting with students to discuss strategies for client meeting |
| | 4/23/2010 | 1 | Meeting-In Office: Meeting with students to discuss hearing strategies |
| | 4/28/2010 | 1 | Meeting-In Office: Meeting with students to discuss hearing strategies |
| | 6/9/2010 | 0.33 | Court Appearance-Adjournment of Impartial Hearing at DOE in Brooklyn, NY |
| | 7/7/2010 | 0.83 | Client Meeting in office |
| | 9/17/2010 | 2 | Meeting in Office: Preparation for impartial hearing |
| | 9/21/2010 | 4.25 | Court Appearance-Impartial Hearing at DOE in Brooklyn, NY |
| | 9/27/2010 | 1 | Meeting-Supervision: Review of August 2010 IEP |
| | 10/20/2010 | 2 | Meeting: Supervision: Reviewing legal arguments for post hearing brief, closing |

Total Hours :          14.58

Lincoln Square Legal Services, Inc.                                          In Re ████████ IHO Case No. 125343

### Clinic Time Report

| Bernard Dufresne | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | | | |
| | 9/3/2010 | 3.50 | Document Review of ████████ Matter |
| | 9/19/2010 | 5.83 | Prepared questions for direct/cross-examination for upcoming hearing on September 21st. Worked on other misc. trial preparation. |
| | 9/20/2010 | 2.00 | Hearing Preparation - Met with partner Siobhain to discuss hearing strategy. |
| | 9/20/2010 | 2.50 | Edited direct/cross examination questions and closing statement. |
| | 9/20/2010 | 0.50 | Telephone Conference with Nick Chavarria (DOE) |
| | 9/21/2010 | 4.25 | Impartial Hearing |
| | 10/1/2010 | 6 | Fact Investigation- Reviewed ████ IEP; Spoke with Nick Chavarria (DOE rep) about evaluations |
| | 10/7/2010 | 1.00 | Client Interview to discuss IEPs and to discuss school placements |
| | 10/15/2010 | 4.33 | Began first draft of the outline for the post hearing, closing brief |
| | 10/21/2010 | 4 | Legal Research - Research of case law to use in drafting of the post hearing, closing brief |
| | 10/25/2010 | 2 | Document analysis of ████████'s evaluations and IEPS to use in drafting the closing statement |
| | 10/28/2010 | 5.5 | Legal Research - Research of further case law to use in drafting of the post hearing, closing brief |
| | 11/1/2010 | 2 | Document Editing - Use of case law, ████████'s IEPs and evaluations to edit first draft of post hearing, closing brief |
| | 11/2/2010 | 6.17 | Further document analysis to add supporting evidence for the composition of second draft of post hearing, closing brief |
| | 11/3/2010 | 3.75 | Document Editing and Drafting - post hearing, closing brief |
| | 11/4/2010 | 7 | Document Drafting and Legal Research - Research of case memorandums and transcripts to assist in the further drafting of the post hearing, closing brief |
| | 11/4/2010 | 2.5 | Document Drafting-post hearing, closing brief |
| | 11/5/2010 | 8 | Document Eiditing - Final editing and drafting of the post hearing, closing brief |

Total Hours
(Fall 2010)              70.83

Lincoln Square Legal Services, Inc.                                           In Re ████████ RHO Case No. 125343

## Clinic Time Report

| Stacy Sadove | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | 10/09/2009 | 1.00 | Review of IEP, review of ppecial education procedures and regulations |
| | 10/15/2009 | 1.50 | Interview with client |
| | 10/16/2009 | 4.50 | Document review and research on special education generally, statutes and definitions |
| | 10/28/2009 | 2.00 | Team meeting - Called Mr. Torres and school teacher of ████ |
| | 10/30/2009 | 2.00 | Special Education research |
| | 11/03/2009 | 2.00 | Call to client; call to school resend fax |
| | 11/03/2009 | 3.5 | Review all records, continue research, revise FAPEmemo |
| | 11/05/2009 | 2.00 | Meeting with school officials |
| | 11/6/2009 | 3.00 | Review of assitional school records, continue drafting of memo, and research on independent evaluations |
| | 11/6/2009 | 1.00 | Draft of retainer agreement |
| | 11/9/2009 | 1.00 | Preparation for client meeting |
| | 11/9/2009 | 2.5 | Client Meeting in office |
| | 11/10/2009 | 4.00 | Review of documents, review of 8NYCRR 200, draft letter to CSE |
| | 11/17/2009 | 5.00 | Draft complaint, complete FAPE memos |
| | 11/19/2009 | 6 | Further draft complaint |
| | 11/20/2009 | 1 | Sign complaint, and met with client to have her sign complaint |
| | 11/24/2009 | 1.00 | Phone call to CSE, review of documents folder |
| | | | |
| | Total Hours (Fall 2009) | 43.00 | |

Lincoln Square Legal Services, Inc.                                    In Re [redacted] IHO Case No. 125343

**Clinic Time Report**

| Siobhain Minarovich | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | 9/3/2010 | 4.50 | Document Review |
| | 9/9/2010 | 2.00 | Legal Research - Research of procedural guidelines for conducting a pre-hearing conference and standards of a "Free and Appropriate Public Education". |
| | 9/10/2010 | 7.50 | Hearing Preparation - Scheduling Enrique's CAP Test; Preparing documents to be sent to Bill Woods (DOE rep) in anticipation of upcoming hearing. |
| | 9/11/2010 | 2.00 | Hearing Preparation - Preparing binder of documents to be used at hearing and to be sent to B. Woods and hearing officer. |
| | 9/14/2010 | 2.50 | Meeting with team to dreview tasks and research for hearing |
| | 9/17/2010 | 6 | Mooting - Mooting arguments with team, draft potentioal direct and cross examination questions, and discussion of team roles in prepartion for hearing |
| | 9/17/2010 | 0.5 | Call with representative from Department of Ed to discuss forthcoming hearing |
| | 9/19/2010 | 8.50 | Hearing Preparation - Meeting with team members to discuss and review arguments to be made at upcoming hearing; Researching summary judgment and default judgment legal standards in preparation to make respective arguments at upcoming hearing; Drafting potential direct and cross examination questions |
| | 9/21/2010 | 4.25 | Hearing - Impartial hearing at the Department of Education |
| | 10/7/2010 | 2 | Meeting - In Office with client, client's son, son's social worker, and education advocate |
| | 10/15/2010 | 1 | Conference - Discussing draft outline of post hearing brief, closing with team |
| | 10/17/2010 | 2.5 | Conference - Review of initial draft and outline of post hearing brief, closing with team |
| | 10/24/2010 | 3 | Legal Research - Research of case law for post hearing brief, closing |
| | 10/26/2010 | 2 | Document Drafting - Review of [redacted]'s evualuations and IEPs for drafting of post hearing brief, closing statement |
| | 10/27/2010 | 2 | Document Drafting of post hearing brief, closing statement. |
| | 10/28/2010 | 4 | Meeting - Student Team editing and redrafting post hearing brief, closing statement |
| | 10/29/2010 | 4 | Legal Research - Further research of case law for post hearing brief, closing statement |
| | 11/3/2010 | 7 | Drafting and Editing - Closing Statement draft edits and revisions |
| | 11/4/2010 | 4 | Document Drafting of post hearing brief, closing |
| | 11/4/2010 | 2 | Meeting with team to review the draft post hearing brief, closing |
| | 11/4/2010 | 2.92 | Document Drafting - Input of further revisions for post hearing brief, closing following conference with team |
| | 11/5/2010 | 9 | Document Editing - Final editing of post hearing brief, closing and submission of closing statement to IHO |

Total Hours :
(Fall 2010)              83.17

Lincoln Square Legal Services, Inc.                                    In Re ██████-IHO Case No. 125343

## Clinic Time Report

| Rachel Wu | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | | | |
| | 1/20/2010 | 3.17 | Document review and legal research concerning impartial hearings |
| | 1/25/2010 | 5.00 | Research into the client's Due Process rights and memo on rights. Called client about additional availabilities for a hearing date. |
| | 1/26/2010 | 3.50 | Contacted ████'s case manager and Bob Woods today. Drafted a request for mediation. We also made the agenda for the client meeting with ██ |
| | 2/24/2010 | 1.42 | Meeting - Outside of Office: Met with client ██████ at her residence to review and discuss the partial agreement and obtain her signature. |
| | 3/10/2010 | 0.3 | Telephone Call: Conference call to client ██████ to discuss case status and upcoming developments |
| | 3/22/2010 | 2 | Document Drafting: Wrote up client meeting summary, looked at claim dissection. |
| | 4/9/2010 | 7.42 | Document Editing: Edited claim dissection and sent to team |
| | 4/21/2010 | 2.67 | Meeting - In Office: After revising client meeting agenda, met with client ██████ to discuss hearing and prepare her for direct and cross examination. |
| | 5/14/2010 | 5 | Document Drafting: Amended status memo and wrote a memo on private schooling. |

Total Hours
(Fall 2009)          30.48

Lincoln Square Legal Services, Inc.                                                              In Re ▮▮▮▮▮▮▮▮IHO Case No. 125343

## Clinic Time Report

| Alexandra Alvarez | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | 1/19/2010 | 3.00 | Case review and Analysis - Reviewed case notes and documents to review and gain familiarity with claims at issue |
| | 1/25/2010 | 0.50 | Met with team to discuss plan for representing client. Contacted client to set up a client meeting. |
| | 1/26/2010 | 1.00 | Team meeting to prepare for Client Meeting. |
| | 1/27/2010 | 1.50 | Meeting in Office - Client meeting with ▮▮▮▮▮ |
| | 1/27/2010 | 0.8 | Telephone conference with Bill Woods (DOE representative) to negotiate a partial resolution |
| | 2/1/2010 | 0.50 | Conference with team to dissect the claims and to initialize research for supporting documents, law and witnesses |
| | 2/2/2010 | 1.5 | Legal Research: Reviewed claims, case law, and potential expert witnesses |
| | 2/3/2010 | 0.50 | Contacted Bill Woods to discuss Independent Evaluations and implementing a plan after each evaluation is done |
| | 2/3/2010 | 2.50 | Legal research regarding NY regulations and classifications |
| | 2/5/2010 | 0.5 | Phone calls to obtain ▮▮▮▮▮ Fall 2007 IEP |
| | 2/7/2010 | 0.5 | Dissection of claims |
| | 2/8/2010 | 1.25 | Further dissection of claims |
| | 2/10/2010 | 1.72 | Research on the costs of Independent Evaluations |
| | 2/10/2010 | 1.5 | Research regarding support for claims in complaint. |
| | 2/10/2010 | 1.5 | Research of the IEP process using the Standard Operating Procedure provided by the DOE |
| | 2/12/2010 | 3.08 | Wrote memo on Independent Evaluators, billing procedures, forms that circulate between the parent, DOE, and independent provider and more. |
| | 2/16/2010 | 3.12 | Claim dissection |
| | 2/23/2010 | 0.67 | Received, reviewed and noted changes/ammendments within the new partial resolution agreement provided by Mr. Woods via e-mail |
| | 2/23/2010 | 1 | Conference with team and supervising attorney Leah Hill to discuss changes proposed in the new partial agreement from Mr. Woods and to draft a new partial agreement in response |
| | 3/1/2010 | 1.33 | Claim dissection |
| | 3/1/2010 | 0.5 | Legal research of case law, including the case of *Rowley* |
| | 3/5/2010 | 0.5 | Conducted analysis of ▮▮▮▮▮ IEPs |
| | 3/8/2010 | 2.5 | Received Assessment Authorization forms from Woods. Contacted independent providers about AA's. |
| | 3/10/2010 | 1.25 | Reviewed the new IEPs and evaluations sent by the DOE |
| | 3/22/2010 | 2.25 | Further reviewed the new IEPs and other evaluations by the DOE in order to add to claim dissection |
| | 3/22/2010 | 1 | Claim dissection |
| | 3/23/2010 | 1 | Finished claim dissection |
| | 4/9/2010 | 8 | Revised claims dissection with appropriate statutory case law. |
| | 4/11/2010 | 3 | Hearing Preparation - Draft and edited the opening statement |
| | 4/13/2010 | 0.5 | Hearing Preparation - Prepared second draft of opening statement |
| | 4/13/2010 | 2.48 | Hearing Preparation - Conference with team to review and perfect opening statement |
| | 4/14/2010 | 1.25 | Hearing Preparation - Drafted claims chart for hearing |
| | 4/18/2010 | 0.5 | Hearing Preparation - Draft questions for witness and client ▮▮▮▮▮ |
| | 4/19/2010 | 4 | Prepared exhibits to send to the CSE for hearing. |
| | 4/21/2010 | 0.5 | Conference with team and supervising attorney Leah Hill to review strategy for client preparation |

Lincoln Square Legal Services, Inc.                                                           In Re ████████IHO Case No. 125343

### Clinic Time Report

| | | | |
|---|---|---|---|
| | 4/21/2010 | 2 | Meeting - In Office: meeting with client to review goals and prepare for client's testimony at hearing |
| | 4/22/2010 | 1.75 | Mailed a hard copy of documents to Bill Woods. Added speech evaluation summary. E-mailed a version of documents to Bill Woods. |
| | 4/23/2010 | 5 | Received a phone call and e-mail from Woods requesting an adjournment. Spoke to Prof. Hill about this. Called Mr. Woods back and discussion with client |
| | 4/24/2010 | 3 | Reviewed all documents and began compiling report/summary of all the documents from the DOE, including results of independent evaluations and more. |
| | 4/25/2010 | 3 | Trial prep - Continued to go through documents and compile analysis |
| | 4/29/2010 | 0.33 | Called Impartial Hearing Officer Ralph Pennington to confirm that the hearing was adjourned. Wrote an e-mail to Laura Byrd from the Impartial Hearing Office and e-mailed Donna Coleman to set up a time for the new hearing date |

Total Hours (Spring 2010) :                          72.28

Lincoln Square Legal Services, Inc.                                              In Re ▮▮▮▮▮▮-IHO Case No. 125343

**Clinic Time Report**

| Bernard Dufresne | Date Worked | Hours Worked | Description of activity |
|---|---|---|---|
| | | | |
| | 2/4/2011 | 0.58 | Research on Attorney's Fees |
| | 2/7/2011 | 2.08 | Document Drafting-Attorney Fee Request preparation and research |
| | 2/8/2011 | 1.42 | Document Drafting-Attorney Fee Request |
| | 2/9/2011 | 2.17 | Document Drafting and research for attorney fee request |
| | 2/11/2011 | 3.17 | Document Drafting-Compiling time records for Attorney Fee Request |
| | 2/12/2011 | 3.08 | Document Drafting-Attorney fee request-inputting student's billing hours into chart |
| | 2/14/2011 | 0.75 | Document Drafting-Attorney fee request |
| | 2/15/2011 | 1.67 | Document Drafting-Attorney fee request application |
| | 2/16/2011 | 2.00 | Document Drafting-Attorney fee request |
| | 2/18/2011 | 1.08 | Document Drafting-Attorney fee request |
| | 2/22/2011 | 1.17 | Document Drafting-Attorney fee request |
| | 2/24/2011 | 1.5 | Document Drafting-Attorney fee request |

Total Hours
(Attorney Fee
Request            20.67
Application)

# Exhibit B

Child's Name: ███████
IHO Case Number: 125343
Parent's Name: ███████
School District: 3

# AFFIRMATION OF LEAH A. HILL, ESQ., IN SUPPORT OF REQUEST FOR ATTORNEY'S FEES PURSUANT TO IDEA

Leah A. Hill, an attorney duly authorized to practice law in the state of New York, affirms the following under penalty for perjury:

1. This affirmation is respectfully submitted in support of our request for attorney's fees and costs under the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.).

2. I am an Associate Clinical Professor at Fordham University School of Law where I teach the Family Advocacy Clinic. I maintain an office at 33 West 60th Street, Third Floor, New York, NY 10023-7905. I am also the supervising attorney with Lincoln Square Legal Services, Inc. ("LSLS"), attorney for the Parent named above. As such, I am fully familiar with the facts and circumstances of this case.

3. The Family Advocacy Clinic is a division of the law firm, LSLS, the non-profit law firm through which the clinical program at Fordham University School of Law provides legal representation to clients.

4. I supervise all law student interns enrolled in the Family Advocacy Clinic.

5. Stacy M. Sadove was enrolled in the Family Advocacy Clinic during the fall of 2009 from August to December. Alex Alvarez and Rachel Wu were enrolled in spring 2010 from January until May. Siobhain Minarovich and Bernard Dufresne were enrolled in the Family Advocacy Clinic in the fall of 2010 from August until December with Bernard Dufresne continuing into the spring 2011 semester. All students were assigned to represent ████ ████ during their respective terms and I met with them at least once a week to review their work on this matter. These students billed all hours that they worked on this case at LSLS.

6. My hours represent the amount of time I spent working on the ███████ matter dating from fall 2009 until fall 2010.

7.  The legal interns and I entered our hours contemporaneously using Time Matters® , the Practice Management Software utilized by LSLS to maintain and manage confidential client files.  The student interns are required to submit copies of their weekly billing reports to my assistant for tracking approximately one time each week.

8.  WHEREFORE, it is respectfully requested that Lincoln Square Legal Services, Inc., be granted attorneys fees for the hours that the above referenced interns and I worked on this matter.

Dated: April 12, 2011

Leah A. Hill, Supervising Attorney

# Exhibit C

# REDACTED

## EDUCATION

**FORDHAM UNIVERSITY SCHOOL OF LAW**                    New York, NY
Juris Doctor, May 2010
Honors: Fordham Public Service Fellowship: Safe Horizon, 2010-11, Archibald R. Murray Public Service
Award, Environmental Law Review, Family Advocacy Clinic, Fordham Law Mediation Clinic
Activities: JLSA (Jewish Law Student Association), HCC (Housing Conservation Coordinators)

**HAMILTON COLLEGE**                    Clinton, NY
B.A., Sociology and Government, May 2007
Activities: Mock Trial (Captain, National Competition), Sailing Team (President), Stryker Fraternity
(President), Hillel (President)
Academics: Senior Theses in Government and Sociology (NYRI Power Lines), Study Abroad Temple
University Rome Program (Spring 2006)

## EXPERIENCE

**PUBLIC SERVICE FELLOWSHIP SAFE HORIZON**                    New York, NY
*Fellow (November 2010- Present)*
Intern to General Counsel. Drafted and reviewed documents including, corporate policies, software licenses,
program licenses, content acquisition agreements, contracts, and MOU's. Conducted legal research.
Reviewed and re-drafted real estate leases. Managed and helped file a DHCR housing case. Reviewed and
approved document requests and responded to subpoena duces tecum. Participated in program review
meetings and trainings of staff.

**FORDHAM LAW FAMILY ADVOCACY CLINIC**                    New York, NY
*Law Clerk (Fall Semester 2009)*
Helped secure appropriate educational services for a child with disabilities; conducted client meetings; led
mediation session with Department of Education; drafted formal complaints; petitioned court to appoint a
guardian for a child seeking Special Juvenile Immigrant Status; drafted related petition, and appeared on
record where petition was ultimately granted.

**EUSTACE & MARQUEZ**                    White Plains, NY
*Fall/Summer Law Clerk (November 2008- August 2009)*
Law Clerk for In House Counsel to Chubb Insurance Westchester Branch. Performed research and prepared
memoranda on various issues in civil law, including insurance defense, worker's compensation, and personal
injury cases. In addition, drafted trial pleadings, motions, and filed motions in court. Observed and
participated in legal proceedings including appellate hearings and depositions.

**THE HONORABLE JUSTICE NORMA RUIZ**
**BRONX SUPREME COURT**                    New York, NY
*Judicial Intern (February 2008-August 2008)*
Assisted in courtroom proceedings, primarily accident liability, foreclosures and medical malpractice suits
and bench conferences for civil court. Helped prepare CLE class on defenses to mortgage foreclosures.
Attended pretrial conferences, settlement negotiations, and evidentiary hearings. Researched case law and
drafted memorandum regarding negligence in landlord tenant matters.

## LANGUAGES AND INTERESTS

Intermediate Italian, basic French, sailing, foreign travel, tennis.

# REDACTED

EDUCATION
**Fordham University School of Law**                                    New York, NY
J.D. Candidate, May 2011
Activities: Lincoln Square Neighborhood Children's Law Project; Black Law Students Association;
          Fordham Health Education Advocacy Law Society; Intramural Basketball
Honors: Willem C. Vis International Arbitration Moot, competitor, Hong Kong (team finished 11th out of 75
          in the world); The Thurgood Marshall Committee, NYC Bar Association, Law student member

**Boston College,** Lynch School of Education                          Chestnut Hill, MA
B.A., Developmental Psychology, May 2007, G.P.A. 3.53
Minor: French Language and Literature;
Honors: Dean's List (2006 & 2007), Member of Pi Delta Phi-National French Honor Society

Study Abroad: **Institut Catholique de Paris**                          Paris, France
Sociology and Political Science coursework with native French students   *Fall Semester 2005*
Recruited to play on a local Parisian basketball team

EXPERIENCE
**Lincoln Square Legal Services, Inc.** (Family Advocacy Clinic)-*Legal intern*   New York, NY
- Represent clients in impartial administrative hearings to secure appropriate educational   *August 2010-Present*
  services for children with learning disabilities
- Interview clients and investigate claims, review and assess medical, mental health and
  educational records
- Prepare physicians, psychologists and education experts to serve as witnesses for trial, and develop
  interdisciplinary case strategies to advance the client's goals.

**City Bar Justice Center-** *Intern*                                   New York, NY
- Coordinated a Temporary Protected Status (TPS) hotline for Haitian immigrants   *May 2010-August 2010*
  by conducting outreach in the Haitian community and recruiting attorneys
- Met with victims of immigration fraud to fill out complaint forms in order to join NYS settlement
- Prepared documents for Haitian immigrants seeking TPS from the U.S. Citizen and Immigration Service

**New York City Bar Association-** *Michael Saperstein Fellow (Fordham Law School competitive fellowship)*   New York, NY
- Coordinated the Thurgood Marshall Summer Law Internship Program; which matches   *March 2009- December 2010*
  high-achieving inner-city high school students with legal internships for the summer
- Worked directly with the Student Legal Education Opportunity Program (SLEOP) director to
  organize a Constitutional Law Symposium for 300 high school students by researching pertinent
  cases and drafting case summaries for attendees
- Pioneered an LSAT/Law School Prep Series for college students interested in applying to law school
- Assisted with the launch of the first NYC Bar Association Mentor Program by recruiting law
  student mentors and pairing them with college students to create networking opportunities for mentees

**Jamaican Council for Human Rights-** *Intern*                         Kingston, Jamaica
- Interviewed prisoners in two area penitentiaries to discuss their options on appeal   *Spring Break 2009*
- Attended trainings and speeches at Norman Manley Law School on the Jamaican justice system
- Wrote petitions to prison superintendents on behalf of prisoners regarding their prison conditions

SKILLS
Native French speaker, proficient in Spanish

# REDACTED

**EDUCATION**

**Fordham University School of Law**, New York, New York
J.D. Candidate, May 2011
Honors:            *Fordham International Law Journal*, Associate Editor
Comment:           *Awaking the Sleeping Dragon: The Evolving Chinese Patent Law and its Implications for Pharmaceutical Patents*, published in 34 *Fordham Int'l L. J.* 549 (2011)
Activities:        Treasurer, Phi Alpha Delta International Law Fraternity, Wormser Chapter
                   Asian Pacific American Law Students Association
                   Fordham Law Women

**Rutgers University**, Piscataway, New Jersey
M.S., Pharmaceutical Sciences, October 2008
Activities:        American Association of Pharmaceutical Scientists

**The College of New Jersey**, Ewing, New Jersey
B.S., *magna cum laude*, Biology, May 2006
Minors: Chemistry, Comparative Literature
Honors:            Dean's List
                   Tribeta Biology Honor Society
                   Sigma Tau Delta English Honor Society
                   Golden Key National Honor Society
Activities:        Chinese Club, Founder and President
                   Circle K, Community Service Club

**EXPERIENCE**

**Shelowitz and Associates, LLC**, New York, New York
*Legal Intern*, January 2011-April 2011
Conducted legal research. Drafted memorandums. Complied documents for appellate briefs. Developed and crafted arguments. Assisted partner and associate in formulating persuasive claims.

**The Najdovski Law Firm, PLLC**, New York, New York
*Legal Assistant*, August 2010-November 2010
Drafted motions, affidavits, and affirmations. Evaluated the strength of potential claims. Found supporting case law for claims. Prepared court documents. Wrote letters to judges and clients.

**The Children's Law Center**, Brooklyn, New York
*Legal Intern*, June 2010-August 2010
Performed document review. Interviewed clients. Prepared documents for court trials. Prepared questions for witness. Conducted legal research. Developed case theory. Summarized forensics records. Found supporting evidence for case theory.

**Lincoln Square Legal Services**, New York, New York
*Legal Intern*, Family Advocacy, January 2010-June 2010
Interviewed client. Conducted legal research. Amended formal complaint. Drafted mediation request. Negotiated partial agreements with opposing side. Participated in impartial hearings.

**Bernstein Liebhard, LLP**, New York, New York
*Summer Associate*, Mass Torts Group, May 2009-August 2009
Compiled expert witness list. Reviewed medical records of potential clients. Evaluated the strengths of potential cases. Reviewed deposition for pending lawsuits with partner and associate. Content writing for law firm's website, focusing on pharmaceutical liability.

**SKILLS**            Proficient in Mandarin Chinese

# REDACTED

## EDUCATION

**Fordham University School of Law,** New York, NY
J.D. Candidate, May 2011
Honors:          *Fordham Environmental Law Journal*

**University College Dublin/Queen's University Belfast** Dublin/Belfast, Ireland
Study Abroad program (Summer 2009)

**Fordham University,** Bronx, NY
B.A., May 2006
Major:          Economics/Mathematics                    Minor: French Literature
Honors:          Dean's List (2002-2004); Pi Delta Phi (French National Honor Society)

## EXPERIENCE

**The Honorable Laura Visitacion-Lewis, Supreme Court, Civil Branch**    New York, NY
Judicial Intern (Spring 2011)
- Analyzed Guardians' annual reports for incapacitated persons.
- Observed Mental Hygiene Law Article 81 proceedings.

**Law Offices of Philip Hersh**                                        Peekskill, NY
Legal Intern (Summer 2010)
- Attended marital conferences and assisted in the preparation of a custody trial.
- Conducted research on family and criminal law matters.
- Interviewed clients and witnesses.

**The Honorable James Reitz, Putnam County Court**                     Carmel, NY
Judicial Intern (Summer 2010)
- Drafted memoranda, opinions, and surrogate's court wrongful death documents.
- Researched case and statutory law and discussed findings with the judge and law clerk.
- Observed conferences, a jury trial, and cross-examinations of witnesses during trials.

**Fordham Family Advocacy Clinic**                                     New York, NY
Legal Intern (Spring 2010)
- Conducted research and engaged in vast discovery in collaboration with a social worker.
- Wrote legal memoranda and opening statement for client hearing.

**Dr. Rebecca Shahmoon Shanok**                                        New York, NY
Bookkeeper/Assistant (August 2008-July 2009)
- Billed patients on a regular monthly basis and managed income, finances, and bills.
- Created/edited PowerPoints and various documents for psychology conferences.

**Ipreo**                                                              New York, NY
Research Analyst (July 2006-August 2008)
- Researched and tracked both U.S. and international IPOs and follow-on deals.
- Wrote profiles describing managers' investment styles for mutual funds.
- Translated French prospectuses and press releases for various company teams.

## LANGUAGE SKILLS

Proficient in French.

# REDACTED

## EDUCATION

| | | |
|---|---|---|
| **FORDHAM UNIVERSITY SCHOOL OF LAW** | | NEW YORK |
| *Candidate for Juris Doctor* | GPA: 3.26 | May 2012 |

- Honors: *Fordham Intellectual Property, Media and Entertainment Law Journal*
- Activities: Legal Education and Advocacy Project – Board Member and CASES Student Teacher
  Domestic Violence Action Center – Courtroom Advocates Project
  Rikers Island Juvenile Inmate Workshop Participant

| | | |
|---|---|---|
| **JOHN JAY COLLEGE OF CRIMINAL JUSTICE/CUNY** | | NEW YORK |
| *Masters of Public Administration* | | June 2006 |

- Concentration: Court Administration  GPA: 3.71
- Honors: Continual Dean's List recipient; *Chancellor's List* award
- Activities: Disabled Student Services Note Taker; Freshman Peer Mentor

| | |
|---|---|
| *Bachelor of Arts* | June 2006 |

- Major: Government  GPA: 3.64
- Honors: Continual Dean's List recipient; CUNY Merit Scholarship
  *Who's Who Among Students in American Universities and Colleges* award
- Activities: *Phi Eta Sigma* National Honor Society – Secretary of John Jay's Chapter
  Student Election Review Committee – Appointed by College President
  John Jay College Law Society – Event Coordinator

## EXPERIENCE

| | |
|---|---|
| **LINCOLN SQUARE LEGAL SERVICES, INC. – FORDHAM LAW FAMILY ADVOCACY CLINIC** | NEW YORK |
| *Legal Intern* | 08/10 – 12/10 |

- Advocated for disabled children in conjunction with social work students from Fordham's Graduate School.
- Interviewed clients, investigated claims, reviewed and assessed medical, mental health, and educational records.
- Prepared physicians, psychologists, and education experts to serve as witnesses at hearings.
- Represented client at impartial hearings to secure appropriate education services.

| | |
|---|---|
| **THE HONORABLE VINCENT M. DEL GIUDICE, KINGS COUNTY SUPREME COURT** | NEW YORK |
| *Judicial Intern* | 06/10 – 08/10 |

- Drafted fact portions of opinions and memorandum.
- Observed conferences, motion hearings, and trials. Discussed proceedings with Judge and Law Clerk.
- Attended judicial intern workshops throughout the courts of Kings County.

| | |
|---|---|
| **SAMUELSON-GLUSHKO INTELLECTUAL PROPERTY & INFORMATION LAW CLINIC – FORDHAM LAW** | NEW YORK |
| *Research Assistant* | 06/10 – 08/10 |

- Composed arguments and prepared sections of briefs to be filed with the courts.
- Conducted legal research on various topics ranging from copyright law to evidence admissibility.
- Attended client meetings and engaged in discussions regarding status of cases.

| | |
|---|---|
| **CRAVATH, SWAINE & MOORE LLP** | NEW YORK |
| *Litigation Case Manager* | 04/10 – 07/10 |

- Returned to firm at Partner's request to assist with copyright infringement and antitrust case.

| | |
|---|---|
| *Litigation Case Manager* | 03/08 – 08/09 |

- Lead legal assistant in major copyright infringement and antitrust case.
- Managed all administrative and document related aspects to litigation and merger clearance matters assigned to supervising Partner.
- Supervised various projects ranging from document reviews to deposition preparation.
- Directed document production of millions of electronic and hard copy pages.
- Oversaw filings of complaints, reply briefs, and summary judgment motions.

| | |
|---|---|
| *Litigation Legal Assistant* | 09/06 – 03/08 |

- Provided paralegal support to a team of two Partners and multiple Associates.
- Conducted market and industry research for antitrust clearance matters.
- Organized voluminous case files of correspondence and work product for both antitrust and litigation matters.

| | |
|---|---|
| **TREYVUS & KONOSKI P.C.** | NEW YORK |
| *Legal Assistant* | 05/05 – 05/06 |

| | |
|---|---|
| **UNITED STATES ATTORNEY'S OFFICE, EASTERN DISTRICT OF NEW YORK** | NEW YORK |
| *Intern, Financial Litigation Unit* | 02/04 – 05/04 |

# Exhibit D

LINCOLN SQUARE LEGAL SERVICES, INC.
Fordham University School of Law
33 West 60th Street, Third Floor
New York, NY 10023
(212) 636-6934

# AGREEMENT BETWEEN YOU AND LINCOLN SQUARE LEGAL SERVICES, INC.

This is an agreement between you, ██████████ and Lincoln Square Legal Services, Inc. ("LSLS"). Pursuant to the Retainer Agreement entered into between you and LSLS on November 9th, 2009 ("Retainer Agreement"), you agree that LSLS will represent you in an application for attorney's fees pursuant to the Individuals with Disabilities Education Act (20 U.S.C. Section 1415(i)(3)(B)(i)).

Further, you agree, as per Paragraph 8 of the Retainer Agreement, that if any attorney's fees are awarded to you, the entire amount will be retained by LSLS to pay its expenses.

Dated: April 11, 2011

███████████, Client

Bernard Dufresne, Legal Intern

Morgan Petriello, Legal Intern

Leah Hill, Supervising Attorney

# Exhibit E

LINCOLN SQUARE LEGAL SERVICES, INC.
**Fordham University School of Law**
**33 West 60th Street, Third Floor**
**New York, New York 10023**
**(212) 636-6934**

## AGREEMENT BETWEEN YOU AND LINCOLN SQUARE LEGAL SERVICES, INC.

This is an agreement between you, ████████, and Lincoln Square Legal Services, Inc. Leah

Hill, Esq., Stacy Sadove, Legal Intern, and Josh Gelb, Legal Intern, are entering this agreement

with you on behalf of Lincoln Square Legal Services, Inc. Here are our agreements:

1. You agree to become our client in connection with the special education advocacy of your child, ████████. We agree to represent you by investigating facts connected with this matter and researching and determining possible options to achieve the goal of appropriate educational placement.

2. You agree that law student interns will provide the legal services to you. We agree that the student's work will be supervised by a lawyer, who is also a law professor at Fordham University.

3. We agree that the law student interns working for you and their supervisor will obey all laws and rules that govern the work of attorneys, including the duty to protect your confidentiality and to zealously represent your position.

4. You are aware that social work students may, in the future, work with you to help you get the legal results you want. You have discussed this part of our agreement with a supervisor in this office. You understand that our policy has been that social workers in this office owe you the same level of confidentiality as is given to you by our lawyers. You also understand that we are looking at a new law to see if has changed this policy. We are studying whether social workers in this office may now be "mandated reporters" – meaning that they would have to report you to the State if they learn from you information that causes them to suspect that you are abusing or neglecting your child or children. If the new law means this, then you will not have as much confidentiality protection from our social workers as you have from our lawyers. Until we reach a final policy on the new law, we agree that if we sense any risk that your confidences might have to be revealed by a social worker in the office, we will immediately work with you to take steps to minimize the risk of a report having to be made.

5. We agree that the social work student interns, if any are assigned, will work under the supervision of a certified social worker, who is an employee of Lincoln Square Legal Services, Inc., and is also a member of the faculty of Fordham University.

6. You agree that the law and social work students interns can work together to achieve the legal results you want.

7. You agree that, in order to work together for you, student interns and their supervisors will act as your team and will discuss your case with one another. You agree that information you provide to one member of the team may be shared with other team members.

8. We agree to provide services at no charge to you. You agree that, if there is a way for us to get paid by other sources, we may pursue that payment. An example of this would be if your case is one in which attorneys' fees have to be paid by another party if you win your case. If that is true, we will pursue those fees as part of the settlement or litigation of your case.

9. There may be expenses that must be paid to others in order to handle your case properly. For example, there may be a filing fee if we need to file papers at the courthouse. For another example, a doctor or hospital might charge us for copies of medical records. You agree to be responsible for paying any such expenses. We agree to keep all costs and expenses to a minimum and to speak with you before incurring any costs that you will need to pay.

10. We all agree that this is the complete agreement between you and us regarding our relationship. We have set out the services we will provide. You agree that we will not be providing any other services to you unless you and we enter into a new agreement for those services. In your case, this means that we have agreed to investigate facts connected with this matter and research and determine possible options to achieve the goal of an appropriate educational placement for your child, ███████████ This agreement does not cover any other services, including an appeal in a case in which representation is provided at hearing or trial, unless a separate representation agreement is signed by the client and the lawyer.

Dated: November 9, 2009          Your Signature as Client ████████████████

Signature _____

Title        Legal Intern   Stacy Sadove

Signature _____

Title        Legal Intern   Josh Gelb

FOR LINCOLN SQUARE LEGAL SERVICES, INC.

# Exhibit F

## FINDINGS OF FACT AND DECISION

Case Number:               125343

Student's Name:            ████████

Date of Birth:             November 26, 1996

District:                  3

Hearing Requested By:      Parent

Date of Hearing:           June 9, 2010
                           September 21, 2010

Hearing Officer:           Ralph Pennington, Jr., Esq.

Hearing Officer's Findings of Fact and Decision

Case No. 125343

---

<u>NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 9, 2010</u>

<u>PARENT</u>
LEAH HILL, Attorney
ALEXANDRA ALVAREZ, Legal Intern
RACHEL WU, Legal Intern
KASI LEGRAND, Social Worker
AARON SCHEINWALD, Legal Intern

<u>DEPARTMENT OF EDUCATION</u>
WILLIAM R. WOODS, CSE Representative

<u>NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 21, 2010</u>

<u>PARENT</u>
LEAH HILL, Attorney
███████████, Parent
BERNARD DUFRESNE, Legal Intern
SIOBHAIN MINAROVICH, Legal Intern
KATHERINE ACOSTA, Social Worker Intern
AARON SCHEINWALD, Legal Intern
TANYA COVINGTON, Social Worker

<u>DEPARTMENT OF EDUCATION</u>
NICHOLAS CHAVARRIA, CSE Representative

Hearing Officer's Findings of Fact and Decision                                    2

Case No. 125343

_____

## PARENT'S POSITION

The parent contends that the New York City Department of Education (hereinafter referred to as "Department"), has failed to identify and properly classify this student for the 2007, 2008 & 2009 school years. The department failed to neither provide the student with an adequate Individualized Education Program (IEP) nor properly implement an IEP for the 2008 and 2009 school years.

With respect to relief, the parent seeks: an related services authorization ("RSA") to receive a minimum of one hundred and ninety-eight hours of compensatory education in the form of speech therapy to compensate for missed services; an RSA to receive three hundred and sixty hours of compensatory education in the form of reading and writing instruction; Committee on Special Education (CSE) to reconvene to draft an appropriate IEP with a deferral to Central Based Support Team (CBST) so that the student may be placed in a nonpublic school setting with transportation provided; and the parent seeks placement at the School for Language and Communication Development.

## DEPARTMENT'S POSITION

The Department is silent as to any argument in opposition, except that if the requested placement is not available then that a comparable placement be made immediately. Secondly, the department argues that the RSA's are provided for specific related services with a specific provider and not for a non-specified provider.

## Evidence presented:

## On Behalf of the Department;

The department presented no documentary or testimonial evidence.

## On Behalf of the Parent;

████████, Parent, testified that she is the parent of the student (Tr.26). She first noticed that the student had issues around ages six or seven (Tr.27). The student was not listening and attending (Tr.27). He had difficulty with his homework (Tr.28). He had difficulty with his homework every day (Tr.29). It would take him five or six hours to do his homework (Tr.29). The student has made no progress in the past five-six years (Tr.32). Said witness requested to the department that the student be reevaluated and

never received a response (Tr.32). She feels that the student requires a small class (Tr.32). She has no difference from last school year to this school year (Tr.33). She would like to be more involved in the IEP process and more in contact with his teachers (Tr.33).

Moreover, the student has difficulties at home (Tr.34). Often, she has to repeat herself when requesting him to do something (Tr.35). The student is currently failing his academic classes (Tr.35).

No cross examination was conducted of this witness.

FINDINGS FACTS AND CONCLUSIONS OF LAW:

I find that the evidence clearly establishes that the student is a fourteen (14) year old student who is classified as speech and language impaired on the October 2, 2009 IEP. The most recent IEP of August 2010 classifies the student with an emotional disturbance. The student presents with poor comprehension, spelling, reading and math skills. Exhibit twenty-two shows that academically, the student performs in a range from 2.6 to 6.0 grade equivalent in various academic domains. The student is impulsive and has difficulty controlling his emotions. He has been diagnosed with attention deficit hyperactive disorder and oppositional defiant disorder.

Compensatory education, i.e., special education services provided to a student is a permissible remedy under the Individuals with Disabilities Education Act (IDEA) when the student has been excluded from school or denied appropriate educational services for an extended period of time (Mrs. C. v. Wheaton., 916 F.2d 69 [2d Cir. 1990]; Burr by Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]; Lester H. v. Gilhool, 916 F.2d 865 [3d Cir. 1990]; Miener v. State of Missouri, 800 F.2d 749 [8th Cir. 1986]). Compensatory education is an equitable remedy that is tailored to meet the circumstances of the case (Wenger v. Canastota, 979 F. Supp. 147 [N.D.N.Y. 1997]). It may be awarded if there has been a gross violation of the IDEA resulting in the denial of, or exclusion from, educational services for a substantial period of time (Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]; Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]; Application of the Bd. of Educ., Appeal No. 02-047).

Hearing Officer's Findings of Fact and Decision                    4

Case No. 125343

---

While, compensatory education is a remedy that is available to students who are no longer eligible for instruction, I note that State Review Officers have awarded additional services to students who remain eligible to attend school and have been denied appropriate services, if such deprivation of instruction could be remedied through the provision of additional services before the student becomes ineligible for instruction by reason of age or graduation (Application of a Child with a Disability, Appeal No. 05-096; Application of a Child with a Disability, Appeal No. 04-054; Application of the Bd. of Educ., Appeal No. 02-047; Application of a Child with a Disability, Appeal No. 02-042; Application of a Child with a Disability, Appeal No. 02-030).

Based upon my review of the record, I find that a gross violation of FAPE was committed by the department for the 2008-2009 and 2009-2010 school years. Therefore, I agree with the parent's attorney that the student is entitled to and has the opportunity to receive the additional services requested. The parent's credible testimony along with exhibits nine, ten, twelve, fourteen and twenty-two, establish the student's delays and lack of progress. Further, the record establishes that the student's classification has been changed numerous times. The department presents no evidence and no witnesses in this matter.

Further, the record substantiates that the student has not been properly evaluated. Exhibits twelve, fourteen and fifteen improperly classify with the non-existent classification of "mentally deficient". A category that does not exist under the IDEA or any applicable New York State Law provisions. The fact that such improper classification was repeated in more than one IEP is proof that the department failed to properly develop an appropriate IEP over a substantial period of time.

Moreover, a review of exhibit fourteen reveals that the IEP team of March 17, 2007 was not properly composed. Said IEP team did not have a special education teacher, a district representative, a parent or a parent member. Said IEP team clearly was missing mandatory members of the team. This evidence further corroborates the parent's argument that the department has not only failed to provide FAPE to this student but failed to develop an appropriate IEP and properly classify this student over a number of years. Furthermore, the parent did not attend the CSE meeting that resulted in exhibits

Hearing Officer's Findings of Fact and Decision                                        5

Case No.  125343
_____

fourteen and fifteen; therefore said IEP's were developed without meaningful participation of a key CSE member, the parent.

Clearly, as a result of the above-noted discussion, the student has been deprived of instruction over a substantial period of time which the department does no refute. Although it is alleged by the parent that the student was not provided with numerous speech therapy sessions, the department fails to present any evidence to rebut and/or counter said argument. On the basis of exhibits sixteen and twenty-two, it appears that the student has missed at least one hundred and ninety-eight hours of speech therapy.

Furthermore, to remedy the denial of FAPE and the lack of instruction and services, under these circumstances, the parent seeks additional services of private tutoring. The record reveals that the student has poor reading and writing skills (Exhibit 30). The parent requests three hundred and sixty hours of private tutoring at the rate of one hundred ten dollars per hour. However, the parent does not submit any evidence to justify the requested enhanced rate, inclusive of a particular provider, for said private tutoring. Therefore, the private tutoring will be provided at the department rate.

Thus, I direct the department to provide the student with the additional services, noted above to allow him to make up for instruction and services that he missed. Thus, the student is to be provided with up to one hundred and ninety-eight hours of speech and language therapy and three hundred and sixty hours of private tutoring, to commence from the date of this decision until June 30, 2012. The private tutoring is to be provided at the department rate.  If necessary, the department is to provide the parent with a Related Services Authorization (RSA) so that she may acquire the necessary additional services noted above.

Lastly, pursuant to the parent's request, a duly constituted CSE team is to reconvene, within two-three weeks, and said CSE team is to consider all evaluations and also consider a deferral to CBST for placement/program and/or the School for Language and Development as a proposed placement. The parent further requests that the student be placed at the School for Language and Communication Development.  However, the record is devoid of any evidence to substantiate the appropriateness of said placement.

Hearing Officer's Findings of Fact and Decision                    6

Case No. 125343

The parent did not testify as to the proposed school nor was any other witness presented to testify to such. There is no documentary evidence to substantiate the appropriateness of the proposed placement. Therefore, the CSE team is to consider said potential placement. It is hereby:

      So Ordered,

The department is to provide the student, as compensatory education, with up to one hundred and ninety-eight hours of speech and language therapy and three hundred and sixty hours of private tutoring, to commence from the date of this decision until June 30, 2012. The private tutoring is to be provided at the department rate. Also, a duly constituted CSE team is to reconvene, within two-three weeks, to develop an appropriate IEP. Said CSE team is to consider all evaluations and also consider a deferral to CBST for placement/program and/or the School for Language and Development as a proposed placement. If necessary, the department is to provide the parent with an RSA so that she may acquire the necessary additional services noted above.

Dated: December 30, 2010

RALPH PENNINGTON, JR., ESQ.
Impartial Hearing Officer

RPJ:jj

Hearing Officer's Findings of Fact and Decision                           7

Case No. 125343

---

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                    8

Case No. 125343

---

### DOCUMENTATION ENTERED INTO RECORD

#### PARENT

| | |
|---|---|
| 1 | Connor's Teacher's Rating Scale, 2003, 4 pp. |
| 2 | Social History, 2003, 3 pp. |
| 3 | Psycho-Educational Evaluation, 1/12/2004 and 2/04/2004, 3 pp. |
| 4 | Psycho-Educational Evaluation, 1/12/2004 and 2/04/2004, 2 pp. |
| 5 | Speech and Language Evaluation 2004, 4 pp. |
| 6 | Structured Classroom Observation Record, 004, 3 pp. |
| 7 | IEP, 2/25/2004, 13 pp. |
| 8 | IEP, 1/11/2005, 10 pp. |
| 9 | Speech and Language Progress Report, 3/01/2005, 1 p. |
| 10 | IEP, 3/10/2005, 18 pp. |
| 11 | Interim Service Plan, 2005, 2 pp. |
| 12 | IEP, 3/17/2006, 14 pp. |
| 13 | IEP, 3/17/2006, 14 pp. |
| 14 | IEP, 3/17/2007, 15 pp. |
| 15 | IEP, 3/20/2008, 13 pp. |
| 16 | IEP, 11/13/2008, 13 pp. |
| 17 | Social History, 2009, 4 pp. |
| 18 | Parent's Letter to Department, Undated, 1 p. |
| 19 | Teacher's Progress Report, 2009, 4 pp. |
| 20 | Functional Behavioral Assessment 2009, 7 pp. |
| 21 | Psycho-Educational Evaluation, 9/25/2009, 17 pp. |
| 22 | IEP, 10/02/2009, 12 pp. |
| 23 | Audiological Evaluation Results 3/30/2010, 1 p. |
| 24 | Speech Evaluation Summary 2010, 5 pp. |
| 25 | Speech Evaluation Full Report 2010, 13 pp. |
| 26 | Progress Reports, 2010, 4 pp. |
| 27 | Psychiatric Report, 5/27/2010, 27 pp. |
| 28 | Neuropsychological Evaluation Report, 4/26/2010, 10 pp. |
| 29 | Results of ENT, 08/18/2010, 1 p. |

#### POST HEARING

| | |
|---|---|
| 30 | IEP, 8/10/10, 14 pp. |

Version: 02/05/2009

| STUDENT NAME | IHO CASE NUMBER | PARENT/GUARDIAN NAME | | |
|---|---|---|---|---|
| ▬▬▬ | 125343 | ▬▬▬ | | |
| ORDER(S) | REQUESTED | COMPLETED | FINAL | AMENDED |
| SERVICE | YES | NO | Locked by Ralph Pennington, Jr. on 12/29/2010 2:35:23 PM | and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:22 PM |
| REIMBURSEMENT | NO | N/A | | |
| PAYMENT | YES | | Locked by Ralph Pennington, Jr. on 12/29/2010 2:35:23 PM | and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:23 PM |

# PAY ORDER

| STUDENT NAME | IHO CASE NO. | PARENT/GUARDIAN NAME |
|---|---|---|
| ██████████ | 125343 | ██████████ |

## The New York City Department of Education (DOE) is directed to PAY

## IT IS FURTHER DIRECTED THAT

Dept. to fund and/or provide the parent with an RSA for the additional services of 198 hours of speech therapy and 360 hours of private tutoring. Private tutoring to be at Board rate. Properly constituted CSE team to reconvene within 2-3 weeks and to consider all evaluations, consider deferal to CBST and proposed placement of SLCD, and devise an appropriate IEP.

**Dated:** ___1|4|11___          **So Ordered:** _____

Finalized and Locked by Ralph
Pennington, Jr. on 12/29/2010
2:35:23 PM
    4th Time Finalized and Locked by
    Ralph Pennington, Jr. on 12/29/2010
        2:42:23 PM

**Ralph Pennington, Jr.**
Impartial Hearing Officer Name

*Ralph Pennington, Jr. Esq.*
Impartial Hearing Officer Signature

## PROOF OF SERVICE PROVISION

**A**  Contract between school/provider  & record of service
    a1 - Contract between parent and school/provider
    a2 - Record of attendance/service

**B**  Invoice for tuition/service on school/provider letterhead  and record of attendance/service (if applicable)
    b1 - Invoice for tuition/service on school/provider letterhead
    **b2** - Record of attendance/service

**C**  School affidavit certifying cost and enrollment/service period

**D**  Copy of independent evaluation report  with date of service

**E**  Daily transportation log identifying destination

**X**  Other service document

**NO** DOE will reimburse parent upon submission of documents supporting the **provision of service**.

| STUDENT NAME | IHO CASE NO | PARENT/GUARDIAN NAME |
|---|---|---|
| | 125343 | █████████ |

SERVICE

4th Time Finalized and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:23 PM
2nd Time Finalized and Locked by Ralph Pennington, Jr. on 6/21/2010 3:17:41 PM

PAYMENT

4th Time Finalized and Locked by Ralph Pennington, Jr. on 12/29/2010 2:42:23 PM

Dated: _____

So Ordered: _____

Ralph Pennington, Jr.

_____
Impartial Hearing Officer Name

_____
Impartial Hearing Officer Signature

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.